**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| GREEN PARTY OF GEORGIA | : | |
| and CONSTITUTION PARTY OF | : | |
| GEORGIA, | : | |
|      Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:12-CV-01822-RWS |
| | : | |
|  BRIAN KEMP, Georgia Secretary | : | |
| of State, | : | |
| | : | |
|      Defendant. | : | |
| | : | |

## ORDER

This case comes before the Court on remand from the Eleventh Circuit

Court of Appeals.  After its consideration of the Eleventh Circuit's decision, as

well as its review of the parties' briefs and the evidence of record, the Court

enters the following Order.

## Background

Plaintiffs are the Green Party of Georgia ("Green Party") and the

Constitution Party of Georgia ("Constitution Party").  They challenge O.C.G.A.

§ 21-2-170, which requires a candidate from a political body seeking inclusion

on an election ballot for an office that is voted upon statewide to obtain

AO 72A
(Rev.8/82)

signatures in a nominating petition from at least one percent of the registered voters eligible to vote in the last election. Currently before the Court on a motion for summary judgment, Plaintiffs seek a declaration that this provision unconstitutionally burdens Plaintiffs' rights under the First and Fourteenth Amendments.

Under Georgia law, a "political party" is any political organization whose candidate received 20 percent of the votes cast in the preceding gubernatorial or presidential election. O.C.G.A. § 21-2-2(25). A candidate may appear on Georgia's election ballot if he or she is nominated in a primary conducted by a political party. O.C.G.A. § 21-2-130(1).

But independent candidates and candidates representing "political bodies" may appear on the election ballot as well. Georgia law provides that such a candidate may access the ballot if he or she submits a nomination petition signed by a specified percentage of voters (one percent for a presidential election). O.C.G.A. § 21-2-170(b).

Plaintiffs filed the present action asserting that each is a political organization or "body" registered under O.C.G.A. § 21-2-110 and § 21-2-113 "desiring to be a qualified party for the purposes of having its candidate put on

AO 72A
(Rev.8/82)

the 2012 Presidential Ballot in Georgia." (Compl., Dkt. [1] ¶3.) Each of the Plaintiffs alleges that it "meets all the statutory requirements to place its presidential candidate on the ballot except for the petition requirements of O.C.G.A. § 21-2-170." (Id.) Plaintiffs allege that "[t]hese signature requirements are in excess of those that satisfy constitutional standards and unduly infringe upon the constitutional rights of the Plaintiffs to participate in the electoral process." (Compl., Dkt. [1] ¶18.) Thus, Plaintiffs ask this Court to declare this statutory scheme unconstitutional and order "that the Plaintiffs be placed on the 2012 Presidential Ballot in Georgia." (Id. at 5.)

## I.      Procedural Background

The Court dismissed Plaintiffs' Complaint on July 17, 2012, concluding that because higher courts have held that the requirement under O.C.G.A. § 21-2-170 for a petition containing at least five percent of the registered voters for certain elections was not unconstitutional, the requirement that a petition contain one percent of the registered voters would not be unconstitutional. (Dkt. [4].) Plaintiffs moved for reconsideration, which the Court similarly denied, relying on Supreme Court and Eleventh Circuit precedent in Jenness v. Fortson, 403 U.S. 431 (1971); Cartwright v. Barnes, 304 F.3d 1138 (11th Cir.

3

2002); and <u>Coffield v. Kemp</u>, 599 F.3d 1276 (11th Cir. 2010) to again conclude that Georgia's ballot petition requirements were not unconstitutional and that therefore Plaintiffs had not stated a claim upon which relief may be granted.

Plaintiffs appealed to the United States Court of Appeals for the Eleventh Circuit.  On January 6, 2014, the Court of Appeals reversed and remanded, holding that this Court employed the type of "litmus-paper test" that the Supreme Court rejected in <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 789 (1983), and directing this Court to instead apply <u>Anderson</u>'s balancing approach.  <u>Green Party of Ga. v. Georgia</u>, No. 13-11816, 551 F. App'x 982 (11th Cir. 2014).  The Court of Appeals further held that this Court erred in dismissing Plaintiffs' action because past decisions "do not foreclose the parties' right to present the evidence necessary to undertake the balancing approach outlined in Anderson."  <u>Id.</u> (citing <u>Bergland v. Harris</u>, 767 F.2d 1551, 1554 (11th Cir. 1985).[1]

## II.    Factual Background

The following facts are taken from the affidavits submitted in support of

---

[1]  The Court of Appeals also directed this Court to dismiss the action against the State of Georgia for lack of jurisdiction, on grounds of Eleventh Amendment immunity.  The Court did so in its Order dated May 6, 2014.  (Dkt. [24].)

4

Plaintiffs' Motion for Summary Judgment or Alternatively for a Preliminary Injunction [7] ("Plaintiffs' Motion for Summary Judgment"),[2] Defendant's Response to Plaintiff's Motion for Summary Judgment [29] ("Defendant's Response"), and Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion for Summary Judgement [34] ("Plaintiffs' Reply").

Each Plaintiff is a political organization or "body" registered under O.C.G.A. § 21-2-110 and § 21-2-113 and "meets all the statutory requirements to place its presidential candidate on the ballot except for the petition requirements of O.C.G.A. § 21-2-170." (Pls.' Statement of Material Facts on Motion for Summary Judgment or Alternatively Motion for a Preliminary Injunction ("Pls.' SOMF"), Dkt. [8] ¶ 1-2; Esco Aff., Dkt. [7-1]; Haag Aff., Dkt. [7-2].)

Defendant Brian Kemp is Georgia's Secretary of State. (Pls.' SOMF, Dkt. [8] ¶ 3.) Under O.C.G.A. § 21-2-50, the Secretary of State is charged with significant duties related to the regulation and supervision of the elections

---

[2] Plaintiffs' motion is styled Motion for Summary Judgment or Alternatively Motion for a Preliminary Injunction [7]. Plaintiffs also filed a Motion to Expedite Proceedings [6] to allow them to participate in the 2012 general election. The motions to expedite and for preliminary relief are moot. Therefore, the Court now considers Plaintiffs' motion as one for summary judgment seeking permanent injunctive relief.

process in Georgia.

Georgia's election code was updated to its current version in 1986. (Pl.'s SOMF, Dkt. [8] ¶ 8.)  Since the passage of that code section,  Ross Perot qualified as an independent presidential candidate in 1992 and 1996, as did Pat Buchanan in 2000.  (Id.; Def.'s Resp. to Pls.' SOMF, Dkt. [30] ¶ 8.)  Plaintiffs have sought to be included on the State of Georgia's presidential ballot in the 2012 and prior elections.  Neither Plaintiff nor any other "minor party," however, has qualified a presidential candidate for statewide ballot access by petition since Mr. Buchanan in 2000.  (Pls.' SOMF, Dkt. [8] ¶ 8.)

While  Plaintiffs' candidates have been unable to access the ballot in Georgia, both the Green Party and the Constitution Party's candidates have been included on other states' ballots.  For example, the Constitution Party's presidential candidates appeared on the ballot in 41 states in a year where its candidate was not included on the Georgia ballot.  (Favorito Aff., Dkt. [7-3] ¶ 2 (explaining that in 1996, the Constitution Party's candidate was denied ballot access despite collecting over 60,000 signatures).)  Additionally, the Green Party's ranks have included "roughly 150 publicly elected officials" at any one time.  (Esco Aff., Dkt. [7-1] ¶ 7 (stating that in 2012, the Green Party had 133

6

elected officials from 22 states and the District of Columbia).)  The Green Party

has also achieved some success with its presidential candidate, Ralph Nader,

who was listed on 46 state ballots and won nearly three percent of the popular

vote nationally in 2000.  (Id. ¶ 11.)

As an alternative to the petition procedure for independent candidates set

forth in O.C.G.A. § 21-2-170, Georgia law provides that a registered political

body may place a candidate on the ballot by nomination at its convention

through one of two avenues.  O.C.G.A. § 21-2-180.  First, a registered political

bodies may file a petition for ballot access through convention with the

Secretary of State.  This petition must be signed by a number of registered

voters equal to one percent of the voters who were registered and eligible to

vote in the preceding general election.  O.C.G.A. § 21-2-180(1).  Second, a

political body may place a candidate on the ballot by nomination at its

convention if the political body received votes equal to one percent of the total

number of registered voters eligible to vote in that election.  O.C.G.A. § 21-2-

180(2).[3]  The Libertarian Party has accessed the ballot in this way on various

---

[3]  Plaintiffs' request for relief from this Court focuses primarily on the petition
requirements found in O.C.G.A. § 21-2-170.  But to the extent relevant, the Court
considers the entire statutory scheme.

occasions.  (Ford Aff., Dkt. [29-1] ¶¶ 6, 9.)  Plaintiffs, however, claim that this provision makes it "impossible" for political bodies such as themselves to alternatively qualify and therefore leaves nomination by petition under O.C.G.A. § 21-2-170 or O.C.G.A. § 21-2-180(1) as Plaintiffs' only viable avenue to access the ballot.  (Pls.' SOMF, Dkt. [8] ¶ 7.)  In support of their contention that nomination petitions are their only workable means of ballot access, Plaintiffs claim that the State does not accurately tally write-in votes (id.), hindering third party or independent candidates from reaching the threshold of one percent of actual votes that would allow a political body "automatic access" under O.C.G.A. § 21-2-180(2).

Now, using Anderson's balancing test as directed by the Court of Appeals, the Court considers Plaintiffs' Motion for Summary Judgment.

## Discussion

### III.  Public Support Requirements

Before turning to the parties' arguments, the Court first discusses public support requirements for ballot access.

Candidate eligibility requirements implicate basic constitutional rights under the First and Fourteenth Amendments.  Anderson, 460 U.S. at 786.  "It

8

is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson, 357 U.S. 449, 460 (1958). The Supreme Court has explained that "strands of 'liberty'" are interwoven through questions of ballot access:

> In the present situation the state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms. We have repeatedly held that freedom of association is protected by the First Amendment. And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States.

Williams v. Rhodes, 393 U.S. 23, 30-31 (1968).

The candidates who appear on the ballot are crucial to the voters' exercise of those First and Fourteenth Amendment rights. "[V]oters can assert their preferences only through candidates or parties or both." Anderson, 460 U.S. at 787. "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary

issues." <u>Lubin v. Panish</u>, 415 U.S. 709, 716 (1974).

Third-party and independent candidates play an important role in the voter's exercise of her rights. "The right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.' " <u>Anderson</u>, 460 U.S. at 787 (internal citations omitted). "The exclusion of candidates also burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens." <u>Id.</u>

However, the important role played by candidates representing parties or political bodies outside the two major parties does not grant those candidates unfettered access to ballots. <u>Anderson</u>, 460 U.S. at 788 ("not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates"); <u>Storer v. Brown</u>, 415 U.S. 724, 730 (1974) ("as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process"). Accordingly, states have enacted comprehensive and

10

complex statutory schemes governing elections.  Each provision of a state's election code "inevitably affects–at least to some degree–the individual's right to vote and his right to associate with others for political ends."  Anderson, 460 U.S. at 788.  These restrictions are, however, generally permissible in light of the state's important regulatory interests, so long as they are reasonable and non-discriminatory.  Id.

Many states, including Georgia, require prospective third-party or independent candidates to demonstrate that they enjoy some public support. These requirements further the state's interest in creating an efficient and transparent election process.  See Jenness v. Fortson, 403 U.S. 431, 442 (1971) ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.").

Plaintiffs claim here that Georgia's requirements place an impermissibly high burden on political bodies seeking to place a candidate on the state's ballot.  The Court now considers whether the State's statutory scheme strikes

an appropriate and constitutional balance between limiting voter confusion and

allowing "new political voices within its borders."  Id.

## IV.    Legal Standard - Summary Judgment

Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  "The moving

party bears 'the initial responsibility of informing the . . . court of the basis for

its motion, and identifying those portions of the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits,

if any, which it believes demonstrate the absence of a genuine issue of material

fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir.

2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where the

moving party makes such a showing, the burden shifts to the non-movant, who

must go beyond the pleadings and present affirmative evidence to show that a

genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material.  Id. at

248.  A fact is not material if a dispute over that fact will not affect the outcome

of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences that are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## V.   Analysis - Plaintiffs' Motion for Summary Judgment [7]

Plaintiffs allege that O.C.G.A. § 21-2-170's signature requirements "are

13

in excess of those that satisfy constitutional standards and unduly infringe upon

the constitutional rights of the Plaintiffs to participate in the electoral process."

(Compl., [1] ¶ 18.)  Section 21-2-170(b) provides:

> A nomination petition of a candidate seeking an
> office which is voted upon state wide shall be signed
> by a number of voters equal to 1 percent of the total
> number of registered voters eligible to vote in the last
> election for the filling of the office the candidate is
> seeking and the signers of such petition shall be
> registered and eligible to vote in the election at which
> such candidate seeks to be elected.

Plaintiffs further allege that the "State of Georgia makes it impossible for

political bodies to alternatively qualify under O.C.G.A. [§] 21-2-180(2) . . .

because the State does not tally the write-in votes accurately, leaving it up to

the counties who usually do not tally the write-in votes."  (Compl., Dkt. [1]

¶ 19.)  Under O.C.G.A. § 21-2-180:

> Any political body which is duly registered [under §]
> 21-2-110 is qualified to nominate candidates for state-
> wide public office by convention if:
>
> (1) The political body files with the Secretary of State
> a petition signed by voters equal in number to 1
> percent of the registered voters who were registered
> and eligible to vote in the preceding general election;
> or

14

> (2) At the preceding general election, the political
> body nominated a candidate for state-wide office and
> such candidate received a number of votes equal to 1
> percent of the total number of registered voters who
> were registered and eligible to vote in such general
> election.

Plaintiffs seek summary judgment that this scheme violates the First and

Fourteenth Amendments to the United States Constitution.

The Eleventh Circuit instructed the Court to evaluate Plaintiffs' claim

under the balancing approach in Anderson v. Celebrezze, 460 U.S. 780 (1983).

In that case, John Anderson, an independent candidate for president, met all of

Ohio's substantive requirements for having his name placed on the ballot for

the general election, but he was unable to participate because the filing

deadline for candidates had passed.  The question presented to the Supreme

Court was whether Ohio's early filing deadline for statements of candidacy

placed an unconstitutional burden on the voting and associational rights of

Anderson's supporters.

In Anderson, the Supreme Court recognized that the direct impact of

Ohio's filing deadline fell on candidates for office, but also noted that the law

burdened voters' constitutional rights to associate for the advancement of their

political beliefs and to cast their votes effectively.  460 U.S. at 787.  The

Supreme Court stated: "Our primary concern is with the tendency of ballot

access restrictions to limit the field of candidates from which voters might

choose.  Therefore, in approaching candidate restrictions, it is essential to

examine in a realistic light the extent and nature of their impact on voters."  Id.

at 786.

However, the Anderson court cautioned: "Although these rights of voters

are fundamental, not all restrictions imposed by the States on candidates'

eligibility for the ballot impose constitutionally-suspect burdens on voters'

rights to associate or to choose among candidates."  Id. at 788.  "[A]s a

practical matter, there must be a substantial regulation of elections if they are to

be fair and honest and if some sort of order, rather than chaos, is to accompany

the democratic processes."  Id. (internal quotations and citation omitted).

Therefore, "the state's important regulatory interests are generally sufficient to

justify reasonable, nondiscriminatory restrictions."  Id.  Among the States'

important regulatory interests are protecting "the integrity and reliability of the

electoral process itself."  Id. n. 9.  For instance, the Supreme Court explained:

"The State has the undoubted right to require candidates to make a preliminary

showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." Id.

Given the competing, legitimate interests at stake, the Supreme Court in Anderson rejected a "litmus-paper test" for separating valid and invalid election restrictions. Id. at 789. Instead, the Court adopted a balancing approach.

First, a court must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." Anderson, 460 U.S. at 789. Next, the court must "identify and evaluate the precise interests put forward by the State as justification for the burden imposed by its rule." Id. In making this determination, the court must consider "the legitimacy and strength of each of those interests" as well as "the extent to which those interests make it necessary to burden the plaintiff's rights." Id. Only after undertaking this analysis can a court conclude whether the challenged restriction is constitutional. Courts in the Eleventh Circuit are directed to follow Anderson's approach to determine whether a ballot access law violates the First and Fourteenth Amendments.

17

<u>Bergland v. Harris</u>, 767 F.2d 1551 (11th Cir. 1985).

> A.    <u>Character and Magnitude of the Asserted Injury to Plaintiffs</u>

For the reasons discussed below, the Court finds that the character of the asserted injury to the right to vote is significant, but that Plaintiffs have failed to carry their burden to show the Court that the alleged injury is of an appreciable magnitude.

In this case, it is obvious that the signature requirements placed a burden on Plaintiffs' exercise of their speech and association rights, given that they were unable to collect the signatures needed to access the ballot. <u>See</u> <u>New Alliance Party of Alabama v. Hand</u>, 933 F.2d 1568, 1574 (11th Cir. 1991). Additionally, as discussed above,  ballot access restrictions may have a substantial impact on both candidates *and* voters.  Simply put, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." <u>Bullock v. Carter</u>, 405 U.S. 134, 143 (1972).  The Court agrees that the constitutional rights at issue are undeniably important and that the Georgia election code burdens the exercise of those rights by the voters writ large.

18

In particular, burdens that fall on new or smaller parties fall on "those voters whose political preferences lie outside the existing political parties." Anderson, 460 U.S. at 793-94 (citing Clements v. Fashing, 457 U.S. 957, 964 (1982)). To that point, Plaintiffs find that their values and priorities are not reflected by the major parties, and that "the choices [the major parties] offer ... are nearly immaterial to the aspirations of the citizens and voters [Plaintiffs] organize to serve." (Esco Aff., Dkt. [7-1] ¶ 26.) Plaintiff the Green Party puts it plainly: "As Greens we believe we're prepared to help address our communities and our nation's problems. The people of Georgia deserve an opportunity to tell us if they agree." (Id. ¶ 29.)

But a statutory scheme is not rendered unconstitutional solely because it has disparate effects on a minor party's and a major party's candidates. To wit, "it has been a constant theme in the cases governing ballot access restrictions that a State need not, and indeed probably should not, treat minor parties and independents the same as major parties." New Alliance Party of Ala. v. Hand, 933 F.2d 1568, 1574-75 (11th Cir. 1991) (citing Williams v. Rhodes, 393 U.S. 23 (1968); Jenness, 403 U.S. at 441-42; American Party of Tex. v. White, 415 U.S. 767, 788 (1974)).

19

Nor is a statute invalid simply because it places a burden on candidates or voters.  Here, while the requirement that Plaintiffs must gather signatures from one percent of registered voters undoubtedly places a burden on Plaintiffs, Georgia's statutory scheme as a whole operates to prevent that burden from being unconstitutional.  In <u>McCrary v. Poythress</u>, the Court of Appeals held that Georgia's election code, which in that case required the plaintiff to obtain signatures from five percent of registered voters, did not place unconstitutional restrictions upon access to the general election ballot. 638 F.2d 1308 (5th Cir. 1981).[4]  In that decision, the court explained that other Georgia code provisions helped ease the burden on would-be candidates.  Of particular relevance here, the length of time petitioners had to gather signatures and the breadth of voters entitled to sign nomination petitions prevented a finding that the five percent signature requirement was unconstitutional.  <u>Id.</u> at 1313.  The Court finds the higher court's decision to be instructive in this case. The statutory scheme in place here is similarly permissive: no voter is obligated to vote for the candidate whose nomination petition she signs; petitioners have

---

[4]  The Eleventh Circuit has adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.  <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

180 days to circulate their petitions; individual signatures need not be

notarized; and voters are not limited to signing only one candidate's petition.

O.C.G.A. § 21-2-170.

In sum, while the Constitutional rights at issue are certainly important

ones that are burdened by O.C.G.A. § 21-2-170, the magnitude of the injury to

Plaintiffs is eased by the other provisions of Georgia's statutory scheme.  The

Court now turns to the second step of the <u>Anderson</u> analysis and considers the

State's interests in limiting access to its ballot.

## B.   The State's Interests

The second step under Anderson is to "identify and evaluate the precise

interests put forward by the State as justification for the burden imposed by its

rule," determining "the legitimacy and strength of each of those interests" and

considering "the extent to which those interests make it necessary to burden the

plaintiff's rights." <u>Anderson</u>, 460 U.S. at 789.  Here, the State of Georgia

offers that it has an interest in avoiding voter confusion and ballot

overcrowding.  (Def.'s Resp., Dkt. [29] at 16-17.)  The Court now evaluates

those interests in light of <u>Anderson</u>'s directive.

The State's interests here are undeniably legitimate.  The Supreme Court

21

and the Eleventh Circuit have consistently recognized that avoiding voter

confusion is a compelling state interest.  Lubin v. Panish, 415 U.S. 709, 715

(1974) ("the State's interest in keeping its ballots within manageable,

understandable limits is of the highest order"); Am. Party of Tex. v. White, 415

U.S. 767, 799 (1974) ("[T]he objectives ostensibly sought by the State, viz.,

preservation of the integrity of the electoral process and regulating the number

of candidates on the ballot to avoid undue voter confusion, are compelling.");

Libertarian Party of Fla. v. Florida, 710 F.2d 790, 793 (11th Cir. 1983) ("[T]he

state has an interest in regulating the election process and avoiding voter

confusion.  That these. . . are compelling has been well established under

decided cases.").  Similarly, avoiding over-crowded ballots is an important

state interest.  Munro v. Socialist Workers Party, 479 U.S. 189, 196 (1986) (a

state is "clearly entitled to raise the ante for ballot access, to simplify the

general election ballot, and to avoid the possibility of unrestrained factionalism

at the general election."); Clements v. Fashing, 457 U.S. 957, 965 (1982)

("[T]he Court has emphasized that the States have important interests in

protecting the integrity of their political processes from frivolous or fraudulent

candidacies, in ensuring that their election processes are efficient, in avoiding

22

voter confusion caused by an over-crowded ballot, and in avoiding the expense and burden of run-off elections."); Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 185 (1979) "the Court expressed concern for the States' need to assure that the winner of an election 'is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections.' ") (quoting Bullock v. Carter, 405 U.S. 134, 145 (1972) (footnote omitted)).

The Court cannot conclude on this record that the State has a real need to decrease voter confusion in Georgia. But because avoiding voter confusion is a compelling state interest, the relevant inquiry becomes one of reasonableness. The inquiry asks "whether the legislative requirement is a rational way to meet" the state's interest, or "whether the statute unreasonably encroaches on ballot access." Libertarian Party of Fla., 710 F.2d. at 793. To emphasize, the state does not have to employ the least restrictive alternative–the state simply must not employ restrictions that unreasonably burden candidates and voters.[5] In

---

[5] Plaintiffs urge the Court to apply strict scrutiny, which requires the State to use the least restrictive means to achieve its ends. (Pls.' MSJ, Dkt. [7] at 9 (citing Illinois State Bd. of Elections, 440 U.S. at 185).) But the Supreme Court has clarified that the "reasonableness" standard of review is appropriate where a state law imposes a restriction that is not "severe." Burdick v. Takushi, 504 U.S. 428, 434 (1992); see

23

fact, the Eleventh Circuit has cautioned courts against whittling away

percentage or number requirements in an un-ending search for a less restrictive

alternative.  Id. ("Once a percentage or number of signatures is established, it

would probably be impossible to defend it as either compelled or least drastic.

At any point, probably a fraction of a percentage point less, or a few petitioners

less would not leave the interests of the state unprotected.  Any numerical

requirement could be challenged and judicially reduced, and then again, and

again until it did not exist at all.").

The Court now considers whether Georgia's signature requirements

unreasonably burden candidates' and voters' rights.  The Court must consider

---

also Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 204 (2008) ("To evaluate a
law respecting the right to vote—whether it governs voter qualifications, candidate
selection, or the voting process—we use the approach set out in Burdick ... [,which]
calls for application of a deferential 'important regulatory interests' standard for
nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that
severely restrict the right to vote.") (Scalia, J., concurring).  The Court cannot
conclude on the record before it that the regulation in question here so severely
restricts the right to vote as to compel strict scrutiny.  A regulation is "severe" and
requires strict scrutiny where, for example, it makes no provision for independent
candidates.  Williams v. Rhodes, 393 U.S. 23 (1968).  Similarly, a law that forced
political parties to open their candidate-selection process to persons wholly
unaffiliated with the party severely burdened the parties' freedom of association, and
was evaluated under strict scrutiny.  California Democratic Party v. Jones, 530 U.S.
567, 581-82 (2000).  The law in question here imposes no such severe burden, and
accordingly, does not compel strict scrutiny.

AO 72A
(Rev.8/82)

the provision that Plaintiffs specifically challenge–O.C.G.A. § 21-2-170–in

light of Georgia's election code more broadly.  <u>Storer v. Brown</u>, 415 U.S. 724,

737 (1974) ("The concept of 'totality' is applicable ... in the sense that a

number of facially valid provisions of election laws may operate in tandem to

produce impermissible barriers to constitutional rights."); <u>Williams v. Rhodes</u>,

393 U.S. 23, 34 (1968) ("But here the totality of the Ohio restrictive laws taken

as a whole imposes a burden on voting and associational rights which we hold

is an invidious discrimination, in violation of the Equal Protection Clause.").

As discussed above, some portions of Georgia's election code scheme

attempt to ease a third party's ability to obtain signatures.  The Supreme Court

and, more recently, the Eleventh Circuit observed that under Georgia's system:

> A voter may sign a petition even though he has signed others, and
> a voter who has signed the petition of a nonparty candidate is free
> thereafter to participate in a party primary. The signer of a petition
> is not required to state that he intends to vote for that candidate at
> the election. A person who has previously voted in a party primary
> is fully eligible to sign a petition, and so, on the other hand is a
> person who was not even registered at the time of a previous
> election.

<u>Cartwright v. Barnes</u>, 304 F.3d 1138, 1141 (11th Cir. 2002) (quoting <u>Jenness</u>,

403 U.S. at 438-39).  Conversely, some portions of the scheme make obtaining

AO 72A
(Rev.8/82)

the required signatures more difficult.  For example, each person circulating a page of the petition must verify by affidavit that the circulation complied with Georgia law.  O.C.G.A. § 21-2-183(b).  The affidavit must be notarized by a person who is not a party to the transaction for which the notarial act is required.  O.C.G.A. §§ 45-17-1(2), 45-17-8(c).  The Georgia Supreme Court has held that a person that circulates any part of a petition is a party to the petition as a whole–therefore the circulator may not act as a notary with respect to any pages of the petition, even those pages which he himself did not circulate.  Poppell v. Lanier et al., 264 Ga. 473 (1994).  Georgia law further places limits on when candidates can collect signatures, admitting no signatures collected more than 180 days before the last day on which the petition may be filed.  O.C.G.A. § 21-2-170(e).  Cf. Libertarian Party of Ala. v. Wallace, 586 F. Supp. 399, 402 (M.D. Al. 1984) (upholding petition requirements where, *inter alia*, Alabama did not place time limits on petition drives).  Taken as a whole, however, these restrictions are not unreasonable on their face.

This Court is instructed to consider the circumstances of other individuals who were able to qualify as minor party candidates under the challenged regulation.  New Alliance Party v. Hand, 933 F.2d 1568, 1574 (11th

Cir. 1991).  The State provides an affidavit by Linda Ford, the Director of the

Elections Division for the Secretary of State.  (Ford Aff., Dkt. [29-1].)  Ms.

Ford refers to the certified election results for U.S. President and Vice-

President and identifies the following persons who qualified to run as

independent or political body candidates pursuant to O.C.G.A. § 21-2-170:

Ross Perot (Independent, 1992); Ross Perot (Reform Party, 1996); and Pat

Buchanan (Independent, 2000).  (Id. ¶ 8.)  Additionally, the Libertarian Party

obtained "automatic" access to the statewide ballot in 1990, pursuant to the

procedure outlined in O.C.G.A. § 21-2-180(2), nominating candidates for

President in each election since.  (Id. ¶ 9.)

     Plaintiffs claim that "[n]o statewide petition to place either an

independent presidential candidate or a minor party presidential candidate has

succeeded in Georgia since 2000."  (Pls.' Reply, Dkt. [34] at 5-6.)  Plaintiffs

further claim that Georgia is one of only two states where no independent

candidate or previously unqualified party's candidate has gained access to the

ballot through statewide petition procedures from 2001 to 2012.  (Id. at 6.)  The

other is Indiana.  Indiana law provides: "A petition of nomination must be

signed by the number of voters equal to two percent (2%) of the total vote cast

at the last election for secretary of state in the election district that the candidate seeks to represent." Ind. Code § 3-8-6-3.

Additionally, Georgia is one of only four states where Ralph Nader–the Green Party's candidate in 1996 and 2000, and an independent candidate in 2004 and 2008–never appeared on the ballot as a presidential candidate.  (Id.) The others are Indiana, North Carolina, and Oklahoma. (Pls.' Reply, Dkt. [34] at 6.)  Indiana's requirements are discussed above.  North Carolina law requires that an "unaffiliated candidate" must

> file written petitions with the State Board of Elections supporting his candidacy for a specified office. These petitions ... must be signed by qualified voters of the State equal in number to two percent (2%) of the total number of voters who voted in the most recent general election for Governor. Also, the petition must be signed by at least 200 registered voters from each of four congressional districts in North Carolina.

N.C. Gen. Stat. § 163-122(a)(1).  An independent candidate seeking access to the ballot in Oklahoma must file "petitions signed by a number of registered voters supporting the candidacy of said candidate for President of the United States equal to at least three percent (3%) of the total votes cast in the last General Election for President." Okla. Stat. tit. 26, § 10-101.1.

The individual states have an important right to regulate their own

28

elections, and the Court discusses other states' provisions only to serve as points of comparison as it considers the operation of Georgia's election code as a whole.  See Libertarian Party of Fla., 710 F.2d at 793 ("A review of the various statutory schemes upheld by the Court supports the view that states are free to adopt differing means of regulating ballot access, as long as the particular scheme is not unnecessarily burdensome.").  Ralph Nader is an example of a third party candidate who achieved relatively widespread support across the nation.  Mr. Nader's failure to access the ballot in Georgia, despite Georgia's petition requirements being a lower percentage bar than in other states where Mr. Nader was similarly denied access, could indicate that the operation of Georgia's election code as a whole serves to unconstitutionally bar access to third party and independent candidates.  But the Court cannot reach that conclusion on the record presently before it.  Plaintiffs provide no evidence to show what efforts they have undertaken to nominate their candidates in this state.  The Court cannot make a meaningful comparison between those candidates who successfully qualified under Georgia's statutory scheme and those who did not.

While the Court recognizes that prior higher court approval does not

automatically render this scheme permissible, the higher court decisions upholding Georgia's election code bolster the Court's determination that summary judgment for Plaintiffs is inappropriate on this record.  In 1971, the Supreme Court considered a challenge to an earlier version of the code section challenged here.  Jenness v. Fortson, 403 U.S. 431 (1971).  There, the Court upheld a Georgia law that required  "a candidate for elective public office who does not enter and win a political party's primary election" to "file a nominating petition signed by at least 5% of the number of registered voters at the last general election for the office in question."  Id. at 432 (citing Ga. Code Ann. § 34-1010 (1970)).  That law imposed a percentage requirement five times that of the statute at issue here and was upheld as constitutional.

Of course, more than thirty years have now passed since the Supreme Court took up the predecessor statute at issue in Jenness.[6]  In Jenness, the Court detailed other ways in which the Georgia statutory scheme "impose[d] no

---

[6]  In the meantime, the Eleventh Circuit Court of Appeals has considered O.C.G.A. § 21-2-170 in its decisions in Cartwright v. Barnes, 304 F.3d 1138 (11th Cir. 2002) and Coffield v. Kemp, 599 F.3d 1276 (11th Cir. 2010) and has upheld that statute on both occasions.  In both cases, the plaintiffs challenged the five percent requirement for congressional offices under O.C.G.A. § 21-2-170(b).  Coffield, 599 F.3d at 1276; Cartwright, 304 F.3d at 1140.

30

suffocating restrictions whatever upon the free circulation of nominating

petitions."[7]  Id. at 438.  And importantly, in its decision in that case, the

Supreme Court noted that:

> The open quality of the Georgia system is far from merely theoretical.
> For the stipulation of facts in this record informs us that a candidate for
> Governor in 1966 and a candidate for President in 1968 gained ballot
> designation by nominating petitions, and each went on to win a plurality
> of the votes cast at the general election.

Id. at 439.  The Court went on to state, "Georgia in no way freezes the status

quo, but implicitly recognizes the potential fluidity of American political life."

Id.  The Court cannot conclude on this record that the political landscape in

Georgia has changed such that those findings are now erroneous.  The Supreme

Court has long "upheld reasonable level-of-support requirements and

classifications that turn on the political party's success in prior elections."

Clements v. Fashing, 457 U.S. 957, 965 (1982) (citing Storer v. Brown, 415

---

[7]  Among the permissive features of Georgia's statutory scheme at the time was
that "[n]o signature on a nominating petition need be notarized."  Jenness, 403 U.S. at
439.  The Eleventh Circuit held in Cartwright that "it is still true that no signature on a
nominating petition need be notarized," because the "notarization requirement [in
O.C.G.A.§ 21-2-170(d)] places no restriction upon the ability of a voter to sign a
petition." 304 F.3d at 1141.  Plaintiffs allege that some of the signatures they collected
on their petitions were invalidated under this provision; this allegation, however, is
largely undiscussed in Plaintiffs' briefs and unsupported by evidence in the record.
(See Favorito Aff., Dkt. [7-3] ¶ 1.)

U.S. 724 (1974); <u>American Party of Tex. v. White</u>, 415 U.S. 767 (1974);

<u>Jenness v. Fortson</u>, 403 U.S. 431 (1971).)

Even so, "the State may not act to maintain the 'status quo' by making it

virtually impossible for any but the two major parties to achieve ballot

positions for their candidates." <u>Clements</u>, 457 U.S. at 965.  But Plaintiffs must

show that the challenges they face in accessing the ballot are attributable to the

particular burdens imposed by Georgia's petition requirements and are not

simply a result of the generic difficulty inherent in gaining access to a ballot.

Plaintiffs have failed to carry that burden here.  "The focal point of this inquiry

is whether a 'reasonably diligent candidate can be expected to satisfy the

signature requirements.' " <u>Libertarian Party of Fla. v. Florida</u>, 710 F.2d at 793

(quoting <u>Storer v. Brown</u>, 415 U.S. at 742) (internal modifications omitted).

Plaintiffs claim that the Green Party of Georgia has "suffered significantly"

from "petitioning[ ]fatigue," in which members of a political party become

discouraged in the face of repeated failure to gather enough signatures to place

their candidate on the ballot.  (Esco Aff., Dkt. [7-1] ¶ 22.)  Yet Plaintiffs

provide no evidence that would allow the Court to conclude they have been

"reasonably diligent" in seeking signatures.[8]   Plaintiffs' diligence remains a genuine issue of material fact.  Therefore the Court cannot conclude, as a matter of law, that Plaintiffs have been unconstitutionally barred from accessing the ballot by the operation of Georgia's laws.

The Court is aware that Georgia's election code has an impact on speech and association rights of more than just Georgia voters.  "[I]n a Presidential election, a State's enforcement of more stringent ballot access requirements. . . has an impact beyond its own borders."  Anderson, 460 U.S. at 495.  Again looking at the example of Mr. Nader's candidacy in 2000, Georgia's laws operated to bar ballot access to a candidate who enjoyed widespread national support.  But on the present record, applying the standard of review compelled by the Court's findings above, the Court cannot conclude that the challenged provisions unconstitutionally burden Plaintiffs' First and Fourteenth

---

[8] In a similarly unsupported statement, the State asserts that presidential elections in Georgia "typically attract a large amount of interest from people interested in being candidates."  (Ford Aff., Dkt. [29-1] ¶ 7.)  This assertion is vague and unsupported by evidence in the record.  Still, Plaintiffs have not convinced the Court that the State's asserted interest does not warrant the present restrictions.  Cf. Williams v. Rhodes, 393 U.S. 23, 33 (1968) ("It is true that the existence of multitudinous fragmentary groups might justify some regulatory control but ... at the present time this danger seems to us no more than 'theoretically imaginable.'  No such remote danger can justify the immediate and crippling impact on the basic constitutional rights involved in this case.").

AO 72A
(Rev.8/82)

Amendment rights.  Accordingly, Plaintiffs' Motion for Summary Judgment must be **DENIED**.

### Conclusion

In accordance with the foregoing, Plaintiffs' Motion for Summary Judgment or Alternatively for a Preliminary Injunction [7] is **DENIED**.

**SO ORDERED**, this 19th day of May, 2015.

_____
**RICHARD W. STORY**
United States District Judge