**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| GREEN PARTY OF GEORGIA and CONSTITUTION PARTY OF GEORGIA, | : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 1:12-CV-01822-RWS |
| v. | : : | |
| BRIAN KEMP, GEORGIA SECRETARY OF STATE, | : : : | |
| Defendant. | : | |

## <u>ORDER</u>

This case comes before the Court on Defendant Brian Kemp's Motion for Summary Judgment [75], Plaintiffs' Motion for Summary Judgment [76], and Plaintiffs' Motion to Strike Defendant's Reply Brief [84].  After reviewing the record, the Court enters the following Order.

## **Background**

Plaintiffs the Green Party of Georgia ("Green Party") and the Constitution Party of Georgia ("Constitution Party") brought this case in advance of the 2012 Presidential Election, challenging Georgia's ballot access laws.

AO 72A
(Rev.8/82)

Plaintiffs challenge O.C.G.A. § 21-2-170, which requires a candidate from a political body seeking inclusion on an election ballot for an office that is voted upon statewide to obtain signatures in a nominating petition from at least one percent of the registered voters eligible to vote in the last election. Plaintiffs seek injunctive relief and a declaration that this provision unconstitutionally burdens Plaintiffs' rights under the First and Fourteenth Amendments.

Under Georgia law, a "political party" is any political organization whose candidate received 20 percent of the votes cast in the preceding gubernatorial or presidential election.  O.C.G.A. § 21-2-2(25).  A candidate may appear on Georgia's election ballot if he or she is nominated in a primary conducted by a political party.  O.C.G.A. § 21-2-130(1).

But independent candidates and candidates representing "political bodies" may appear on the election ballot as well.  Georgia law provides that such a candidate may access the ballot if he or she submits a nomination petition signed by a specified percentage of voters (one percent for a presidential election).  O.C.G.A. § 21-2-170(b).

Plaintiffs filed the present action asserting that each is a political

AO 72A
(Rev.8/82)

organization or "body" registered under O.C.G.A. § 21-2-110 and § 21-2-113 "desiring to be a qualified party for the purposes of having its candidate put on the 2012 Presidential Ballot in Georgia." (Compl., Dkt. [1] ¶3.) Each of the Plaintiffs alleges that it "meets all the statutory requirements to place its presidential candidate on the ballot except for the petition requirements of O.C.G.A. § 21-2-170." (Id.) Plaintiffs allege that "[t]hese signature requirements are in excess of those that satisfy constitutional standards and unduly infringe upon the constitutional rights of the Plaintiffs to participate in the electoral process." (Id. ¶18.) Thus, Plaintiffs ask this Court to declare this statutory scheme unconstitutional and order "that the Plaintiffs be placed on the 2012 Presidential Ballot in Georgia." (Id. at 5.)

This case has had a long history in this Court and in the Eleventh Circuit Court of Appeals. In the interim, the 2012 Presidential Election has come and gone.[1]  Now, facing the 2016 Presidential Election, the Court once again

---

[1] Even though the 2012 election is over, this case is not moot. This is, as evidenced by the impending 2016 election, "a case where the controversy is 'capable of repetition, yet evading review.'" See Storer v. Brown, 415 U.S. 724, 737 n. 8 (1973) (holding that a challenge based on the 1972 election, which had passed, was not moot, "since the issues properly presented, and their effects on independent candidacies, will persist as the ... statutes are applied in future elections.").

recites the procedural history and facts relevant to the present motions.

## I.     Procedural Background

The Court dismissed Plaintiffs' Complaint on July 17, 2012, concluding that because higher courts have held that the requirement under O.C.G.A. § 21-2-170 for a petition containing at least five percent of the registered voters for certain elections was not unconstitutional, the requirement that a presidential candidate's petition contain one percent of the registered voters would not be unconstitutional.  (Dkt. [4].)  Plaintiffs moved for reconsideration, which the Court similarly denied, relying on Supreme Court and Eleventh Circuit precedent in Jenness v. Fortson, 403 U.S. 431 (1971); Cartwright v. Barnes, 304 F.3d 1138 (11th Cir. 2002); and Coffield v. Kemp, 599 F.3d 1276 (11th Cir. 2010), to again conclude that Georgia's ballot petition requirements were not unconstitutional and that therefore Plaintiffs had not stated a claim upon which relief may be granted.

Plaintiffs appealed to the United States Court of Appeals for the Eleventh Circuit.  On January 6, 2014, the Court of Appeals reversed and remanded, holding that this Court employed the type of "litmus-paper test" that the Supreme Court rejected in Anderson v. Celebrezze, 460 U.S. 780, 789

4

(1983), and directing this Court to instead apply <u>Anderson</u>'s balancing approach.  <u>Green Party of Ga. v. Georgia</u>, No. 13-11816, 551 F. App'x 982 (11th Cir. 2014) (hereinafter, "<u>Green Party I</u>").  The Court of Appeals further held that this Court erred in dismissing Plaintiffs' action because past decisions "do not foreclose the parties' right to present the evidence necessary to undertake the balancing approach outlined in <u>Anderson</u>."  <u>Id.</u> (citing <u>Bergland v. Harris</u>, 767 F.2d 1551, 1554 (11th Cir. 1985).[2]

On May 19, 2015, applying the <u>Anderson</u> standard as instructed, the Court issued an Order denying Plaintiffs' (First) Motion for Summary Judgment.  <u>Green Party of Ga. v. Kemp,</u> 106 F. Supp. 3d 1314, 1321 (N.D. Ga. 2015) (hereinafter, "<u>Green Party II</u>").[3]  The parties engaged in additional discovery and filed the present cross-motions for summary judgment on the developed record.

---

[2]  The Court of Appeals also directed this Court to dismiss the action against the State of Georgia for lack of jurisdiction, on grounds of Eleventh Amendment immunity.  The Court did so in its Order dated May 6, 2014.  (Dkt. [24].)

[3]  For the purposes of this Order, the Court will cite to the published version of its May 19, 2015 Order.  That earlier Order is also available at Docket Entry [35].

5

## II.    Factual Background[4]

Each Plaintiff is a political organization or "body" registered under

O.C.G.A. § 21-2-110 and § 21-2-113 and "meets all the statutory requirements

to place its presidential candidate on the ballot except for the petition

requirements of O.C.G.A. § 21-2-170."  (Pls.' Statement of Material Facts on

Mot. for Summ. J. or Alternatively Mot. for a Prelim. Inj. ("Pls.' 1st SOMF"),

Dkt. [8] ¶ 1-2; 2012 Esco Aff., Dkt. [7-1]; 2012 Haag Aff., Dkt. [7-2].)

Defendant Brian Kemp is Georgia's Secretary of State.  (Pls.' 1st SOMF,

Dkt. [8] ¶ 3.)  Under O.C.G.A. § 21-2-50, the Secretary of State is charged with

significant duties related to the regulation and supervision of the elections

process in Georgia.

### A.    History of Georgia's Ballot Access Restrictions

In 1922, Georgia passed a law that authorized government-printed

ballots.  (Pl.'s Statement of Material Facts to Which There is No Genuine Issue

---

[4]  The following facts are taken from the affidavits submitted in support and opposition of Plaintiffs' [First] Motion for Summary Judgment or Alternatively for a Preliminary Injunction [7], Defendant Brian Kemp's Motion for Summary Judgment [75] and Plaintiffs' Motion for Summary Judgment [76].  Because the case is before the Court on cross-motions for summary judgment, the Court construes the facts in favor of the non-movant for each respective motion.

to be Tried ("Pls.' SOMF"), Dkt. [76-2] ¶ 9.)  Prior to that, Georgia had no ballot access law.  (Id. ¶ 8.)  From 1922 until 1943, independent and political party candidates could access the November ballot "with no petition and no fee."  (Id. ¶ 9.)  In 1943, Georgia adopted a 5% petition requirement for access to the general election ballot.[5]  (Id. ¶ 11.)

In 1944, 27,500 signatures were required to access the presidential ballot in Georgia; no candidates qualified.  (App'x to 2015 Winger Aff., Dkt. [76-3] at 8.)  In 1960, candidates needed 65,530 signatures and in 1964, candidates needed 65,107 signatures; no candidates qualified either year.  (Id. at 9.)  In 1968, one party cleared the 83,339 signature threshold.  (Id.)  In 1972 and 1976, candidates needed to collect 98,022 and 108,395 signatures, respectively; no third-party or independent candidates were on Georgia's ballot either year. (Id.)  In 1980, two candidates qualified with over 57,540 signatures.  (Id.)

Georgia's election code was amended to include the current one percent

---

[5]  Plaintiffs assert that this requirement was adopted "as a means of prohibiting Republicans, Communists, and Black people from accessing the Georgia ballot." (Pls.' SOMF, Dkt. [76-2] ¶ 11.)  Defendant contests this assertion.

petition requirement in 1986.[6]  (Pl.'s 1st SOMF, Dkt. [8] ¶ 8.)

In 1992, Ross Perot collected at least 26,955 signatures to be the sole qualifying candidate.  (App'x to 2015 Winger Aff., Dkt. [76-3] at 9.)  In 1996 and 2000, respectively, the Reform party garnered at least 30,036 and 39,094 signatures.  (Id.)  Since 2000, no independent or third-party candidate has qualified by petition.  The signature requirement in 2004 was 37,153; in 2008, 42,489; and in 2012, 50,334.  (Id.)

In addition to the number of signatures required by O.C.G.A. § 21-2-170, Georgia law imposes other requirements on candidates seeking to access a ballot through petition.  Each sheet of a political body or independent candidate's nomination petition must bear the circulator's affidavit, which must

---

[6]  In Jenness v. Fortson, the Supreme Court upheld the 5% petition requirement found in the predecessor statute to O.C.G.A. § 21-2-170.  403 U.S. 431, 433 (1971). That law required that a "petition must be signed by 'a number of electors of not less than five per cent. of the total number of electors eligible to vote in the last election for the filling of the office the candidate is seeking.'" Id. (quoting Ga. Code Ann. § 34-1010).  Jenness involved a challenge brought by would-be gubernatorial and congressional candidates.
   In Cartwright v. Barnes, the Eleventh Circuit heard a challenge to the present version of O.C.G.A. § 21-2-170 brought by members of the Libertarian party who wished to run for congressional office.  304 F.3d 1138, 1139 (11th Cir. 2002).  The Cartwright court upheld the 5% petition requirement as applied to congressional candidates.  Id. at 1141-42.

8

be subscribed and sworn before a notary public.  O.C.G.A. § 21-2-170(d).  The affiant must, *inter alia*, swear that each signature was signed within 180 days of the last day on which the petition may be filed.  Id.  Additionally, different sheets must be used by signers residing in different counties or municipalities. Id.

As an alternative to the petition procedure for candidates set forth in O.C.G.A. § 21-2-170, Georgia law provides that a registered political body may place a candidate on the ballot by nomination at its convention through one of two avenues.[7]  O.C.G.A. § 21-2-180.  First, a registered political body may file a petition for ballot access through convention with the Secretary of State. Like a petition submitted pursuant to O.C.G.A. § 21-2-170, this petition must be signed by a number of registered voters equal to one percent of the voters who were registered and eligible to vote in the preceding general election. O.C.G.A. § 21-2-180(1).  Essentially, Section 180 allows a political body to petition to place a whole slate of candidates on the ballot.  Georgia's election code allows a political body fifteen months to collect those petition signatures.

---

[7] Plaintiffs' request for relief from this Court focuses primarily on the petition requirements found in O.C.G.A. § 21-2-170.  But to the extent relevant, the Court considers the operation of the entire statutory scheme.

9

O.C.G.A. § 21-2-182. The State does not impose any geographic distribution requirement for petition signatures. See generally id., O.C.G.A. § 21-2-183. A voter may sign as many petitions as he or she wishes. Id. Further, Georgia does not place limits on how many petition signatures a political body or candidate may submit. (Harvey Aff., Dkt. [75-3] ¶¶ 28-29.)

Second, a political body may place a candidate on the ballot by nomination at its convention if the political body received votes equal to one percent of the total number of registered voters eligible to vote in the preceding election. O.C.G.A. § 21-2-180(2). The Libertarian Party has accessed the ballot in this way on various occasions. (2012 Ford Aff., Dkt. [29-1] ¶¶ 6, 9; Harvey Aff., Dkt. [75-3] at 5 n.1.) Plaintiffs, however, claim that this provision makes it "impossible" for political bodies such as themselves to alternatively qualify and therefore leaves nomination by petition under O.C.G.A. § 21-2-170 or O.C.G.A. § 21-2-180(1) as Plaintiffs' only viable avenues to access the ballot. (Pls.' 1st SOMF, Dkt. [8] ¶ 7.) In support of their contention that nomination petitions are their only workable means of ballot access, Plaintiffs claim that the State does not accurately tally write-in votes (id.), hindering third party or independent candidates from reaching the threshold of one percent of

10

actual votes that would allow a political body "automatic access" under

O.C.G.A. § 21-2-180(2).

### B.      Other States' Ballot Access Restrictions

In support of their Motion for Summary Judgment, Plaintiffs submit an

affidavit by Richard Winger that discusses Georgia's ballot access

requirements in the context of other states' restrictions.[8]  (2015 Winger Aff.,

Dkt. [76-3].)  Mr. Winger also submits an appendix of historical voting data in

support of his assertions in his affidavit.  (App'x to 2015 Winger Aff., Dkt.

[76-3] at 6-22.)  Mr. Winger opines that "if a state requires even slightly more

than 5,000 signatures for an independent presidential candidate, or the

presidential candidate of an unqualified party, to get on the ballot, it will never

have a crowded presidential general election ballot."  (2015 Winger Aff., Dkt.

[76-3] ¶ 1.)  The data he submits show that, of the 401 instances in which a

state required independent candidates or candidates of an unqualified party to

_____

[8]  Defendant challenges Mr. Winger's expert opinion as based on "an incorrect legal standard" and incomplete data.  (Def.'s Resp. in Opp'n to Pls.' MSJ, Dkt. [80] at 10 (citing Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993)).)  Courts have considered Mr. Winger's expert testimony in many other cases and this Court finds that he is a reliable witness.  Moreover, the Court primarily has relied on Mr. Winger as a gatherer of data, and there is no suggestion here that the data are inaccurate.

collect more than 5,000 signatures, no candidate was able to access the ballot 33% of the time.  (Id. ¶ 4.)  One candidate was able to access the ballot 20% of the time; two candidates, 20%; three candidates, 13%; four candidates, 8%; five candidates, 4%; and six candidates were able to qualify only 4% of the time.  (Id.)

###### C.      Third-Party or Political Body Candidates in Georgia

Since the passage of Georgia's current code section in 1986,  Ross Perot qualified as an independent presidential candidate in 1992 and 1996, as did Pat Buchanan in 2000.  (Pl.'s 1st SOMF, Dkt. [8] ¶ 8; Def.'s Resp. to Pls.' 1st SOMF, Dkt. [30] ¶ 8.)  Plaintiffs have sought to be included on the State of Georgia's presidential ballot in the 2012 and prior elections.  Neither Plaintiff nor any other "minor party," however, has qualified a presidential candidate for ballot access by petition since Mr. Buchanan in 2000.  (Pls.' SOMF, Dkt. [76-2] ¶ 13.)

###### 1.      *Green Party Efforts to Access the Ballot*

The Georgia Green Party attempted to place its candidates on Georgia

12

Presidential ballots through petition drives in 2000, 2004, 2008, and 2012.[9] (Pls.' SOMF, Dkt. [76-2] ¶ 23.)

For the 2000 election, Georgia Green Party activists began circulating nominating petitions in the summer or fall of 1999.  (Id. ¶ 27.)  The Atlanta Police Department issued criminal trespass warnings to Green Party petitioners collecting signatures at the Atlanta Pride Festival in June of 2000.  (Id. ¶ 28.) Following this incident, the Green Party continued to collect signatures, ultimately collecting around 9,000 signatures for their presidential candidate's petition to access the Georgia ballot.  (Id. ¶ 30.)  In 2000, nearly 40,000 signatures were required.  (Id. ¶ 30.)  Accordingly, the Green Party's candidate, Ralph Nader, did not appear on Georgia's ballot, even while appearing on the ballot in 43 other states.  (Id. ¶ 32.)

In 2004, the Georgia Green Party collected about 3,000 signatures for the Party's  presidential ticket.  (Id. ¶ 39.)  That year, Georgia required 37,153 signatures to access the ballot.  (App'x to 2015 Winger Aff., Dkt. [76-3] at 4.)

---

[9] Plaintiffs also circulated petitions in these and other years in attempts to place other, non-presidential candidates on the ballot.  As discussed in Part VI, the ballot access analysis in this case hinges on the particularities of a presidential election.  The Court, therefore, does not discuss Plaintiffs' attempts to access a non-presidential ballot.

13

The Green Party's presidential ticket was included on 28 other state ballots and garnered write-in votes in 15 additional states, including Georgia.  (Pls.' SOMF, Dkt. [76-2] ¶ 41.)

In 2008, a "handful of volunteers collected a few hundred signatures" for the Green Party's presidential candidate, Cynthia McKinney.  (Id. ¶ 42.)  The Green Party, however, ultimately chose not to "expend their energies on a petition drive."  (Id.)

In 2008, Georgia required 42,489 signatures to access the presidential ballot.  (App'x to 2015 Winger Aff., Dkt. [76-3] at 4.)  Ralph Nader again ran for President, this time as an Independent candidate.  (Pls.' SOMF, Dkt. [76-2] ¶ 44.)  In light of Georgia's signature requirement, the Nader campaign "made a strategic decision," and "did not even consider attempting to qualify for the ballot in Georgia" because of the "excessive hurdle" the petition requirement put on his "volunteer, grass-roots efforts."  (Kafoury Decl., Dkt. [76-9] ¶¶ 3-4.)  Mr. Nader qualified to be on the 2008 Presidential ballot in 45 other states.  (Pls.' SOMF, Dkt. [76-2] ¶ 45.)  Georgia is one of only four states in which Mr. Nader did not appear on the ballot in any of his Presidential runs.  (Id. ¶ 46.)

In 2012, the Green Party focused their petition efforts on Kwabena

Nkromo accessing the ballot for House District 57 rather than on presidential petitions.  (2015 Esco Aff., Dkt. [76-6] ¶ 48.)  The Party's candidate for President, Jill Stein, ran as a write-in candidate.  (Pls.' SOMF, Dkt. [76-2] ¶ 47.)

### 2.    *Constitution Party Efforts to Access the Ballot*

The Constitution Party of Georgia is the successor party to the U.S. Taxpayers of Georgia ("U.S. Taxpayers Party").  (Def. Brian Kemp's Statement of Material Facts Not in Dispute ("Def.'s SOMF"), Dkt. 75-1 ¶ 2.)  The U.S. Taxpayers Party, like the Green Party, has sought to place its candidates on the presidential ballot in Georgia through petition.  (Pl.'s MSJ Br., Dkt. [76-1] at 22.)

In 1996, the U.S. Taxpayers Party circulated petitions to submit its candidate, Howard Phillips, to the presidential ballot in Georgia.   (Pls.' SOMF, ¶ 50.)  The Party collected approximately 40,000 signatures in three weeks. (Def.'s SOMF, Dkt. [75-1] ¶ 79.)  That year, 30,036 signatures were required to gain access to the ballot. (App'x to 2015 Winger Aff., Dkt. [76-3] at 4; Pls.' SOMF, Dkt. [76-2] ¶ 51.)  The Secretary of State ultimately rejected the U.S. Taxpayers Party's petition, however, on grounds that many of the signatures

15

were invalidated because they had been collected by a notary.  (Pls.' SOMF, Dkt. [76-2] ¶ 51.)  The Party challenged the rejection in federal court, but the complaint was dismissed on grounds that the signatures collected by the notaries were, in fact, invalid under Georgia law.[10]  Nat. Law Party of Georgia v. Massey, No. CIV.A.1:96-CV-2524CC, 1996 WL 1062558, at *2 (N.D. Ga. Oct. 17, 1996).  Accordingly, although the U.S. Taxpayers Party had gathered over 40,000 signatures on a petition to place its candidate on Georgia's ballot, Mr. Phillips was not included on the 1996 November ballot and instead ran as a write-in candidate.  (Pls.' SOMF, Dkt. [76-2] ¶ 53.)  Mr. Phillips appeared on the ballot in 41 other states.  (Id.)

In 2004, the Constitution Party was unable to collect the signatures required to get its candidate, Michael Peroutka, on the general election ballot.

---

[10]  "[E]ach person circulating a page of the petition must verify by affidavit that the petition was circulated in a manner which complied with Georgia law. O.C.G.A. § 21–2–183(b). In order for the affidavit to be valid, it must be notarized by a person who is not a party to the transaction for which the notarial act is required. O.C.G.A. §§ 45–17–1(2), 45–17–8(c). The Georgia Supreme Court has held that a person who circulates pages of a petition is a party to the petition as a whole. Therefore, the circulator may not act as a notary with respect to any pages of the petition—even those pages which he did not circulate. Poppell v. Lanier et al., 264 Ga. 473 (1994)." Nat. Law Party of Georgia v. Massey, No. CIV.A.1:96-CV-2524CC, 1996 WL 1062558, at *2 (N.D. Ga. Oct. 17, 1996).

AO 72A
(Rev.8/82)

(Id. ¶ 58.)  Mr. Peroutka appeared on the ballot in 34 other states and ran as a

write-in candidate in Georgia.  (Id. ¶ 59.)  Similarly, in 2008, the Constitution

Party's candidate, Chuck Baldwin, appeared on the ballot in 37 other states, but

ran as a write-in candidate in Georgia.  (Id. ¶¶ 67-69.)  In 2012, Virgil Goode,

the Constitution Party's candidate, appeared on the ballot in 26 other states but

ran as a write-in candidate in Georgia.  (Id. ¶¶ 74-75.)  Georgia is one of only

five states in which the Constitution Party's Presidential candidate has never

appeared on the ballot.  The others are Arizona, Indiana, North Carolina, and

Oklahoma.[11]  (Id. ¶ 75.)

>    D.    Practicalities of Circulating Petitions

Plaintiffs provide evidence of the costs of collecting petition signatures.

Political bodies may employ paid petitioners to collect signatures.  Tom Yager,

co-chair of the national Green Party's access committee, states that in his

experience, a paid petitioner charges about $2 per signature, in addition to

lodging and travel expenses.  (Pls.' SOMF, Dkt. [76-2] ¶ 15.)  Because

signatures may be invalidated for a variety of reasons, Mr. Yager attempts to

---

[11]   Similarly, Ralph Nader was never listed on the Presidential ballot of Georgia,
Indiana, North Carolina, or Oklahoma.  See the discussion of these states' election
provisions at Part VI(C).

collect more signatures than the required number.  For the approximately 50,000 signatures required to access the 2016 ballot in Georgia, the Green Party finds it would be "prudent to collect about 78,000 raw signatures to ensure a sufficient number of valid signatures."  (Id. ¶ 17.)  Mr. Yager estimates that a statewide petition drive in Georgia would cost about $140,00 to $150,000.  (Id.)

Other political body officials estimate the costs differently: Hugh Esco, former Green Party candidate, estimates that the cost of securing over 50,000 valid signatures would be approximately $175,203 plus qualifying fees.  (Id. ¶ 21.)  Ricardo Davis, state chairman of the Constitution Party of Georgia, estimates that the cost of achieving the Constitution Party's minimum petitioning goal of 70,000 signatures would run from $70,000 to $350,000.  (Id. ¶ 20.)

Once a party successfully accesses a ballot once, it is easier for the party to qualify for the next election cycle.  For example, Ross Perot used "millions of dollars from his own personal fortune" to fund his campaigns and petition drives, including "his successful qualification as an independent presidential candidate in 1992 and his successful qualification as the Reform Party's

18

Presidential candidate in 1996." (Id. ¶ 81.) Mr. Perot accumulated enough votes in the 1996 election to qualify the Reform Party "for millions of dollars in [Federal Election Commission] funds that could be used during the 2000 election, and which were used by Pat Buchanan as the Reform Party Presidential candidate to fund his campaign and petition drives that successfully qualified him as a Presidential candidate in 2000." (Id. ¶ 82.)

The Georgia Libertarian Party successfully submitted a petition for ballot access in 1988, when the requirement was 25,759 signatures. (Id. ¶ 86.) The Libertarian Party has since been relieved of the need to petition because it has qualified for access pursuant to O.C.G.A. § 21-2-180(2), which allows "automatic" ballot access (through nomination by convention) to a political body that garnered one percent of the vote in the preceding election. (Id.)

E.    Third-Party or Political Body Candidates in Other States

While  Plaintiffs' candidates have been unable to access the ballot in Georgia, both the Green Party and the Constitution Party's candidates have been included on other states' ballots. For example, in 1996, the Constitution Party's presidential candidates appeared on the ballot in 41 states. (2012 Favorito Aff., Dkt. [7-3] ¶ 2.) Additionally, the Green Party's ranks have

19

included "roughly 150 publicly elected officials" at any one time.  (2012 Esco

Aff., Dkt. [7-1] ¶ 7 (stating that in 2012, the Green Party had 133 elected

officials from 22 states and the District of Columbia).)  The Green Party has

also achieved some success with its presidential candidate, Mr. Nader, who was

listed on 46 state ballots and won nearly three percent of the popular vote

nationally in 2000.  (Id. ¶ 11.)

### Discussion

As an initial matter, Plaintiffs' Motion to Strike Defendant's Reply Brief

[84] is **DENIED**.  Now, on this procedural and factual background, the Court

proceeds to discuss the relevant law before beginning its analysis of the parties'

cross-motions for summary judgment.

### III.    Public Support Requirements for Ballot Access

In its May 19 Order, the Court reviewed public support requirements for

ballot access.  See Green Party II, 196 F. Supp. 3d at 1318-19.  Because of the

rights and interests at stake here, that discussion bears repeating.

First and foremost, candidate eligibility requirements implicate basic

constitutional rights under the First and Fourteenth Amendments.  Anderson v.

Celebrezze, 460 U.S. 780, 786 (1983).   "It is beyond debate that freedom to

20

engage in association for the advancement of beliefs and ideas is an inseparable

aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth

Amendment, which embraces freedom of speech."  Nat'l Ass'n for

Advancement of Colored People v. State of Ala. ex rel. Patterson, 357 U.S.

449, 460 (1958).  The Supreme Court has explained that "strands of 'liberty'"

are interwoven through questions of ballot access:

> In the present situation the state laws place burdens on two
> different, although overlapping, kinds of rights—the right of
> individuals to associate for the advancement of political
> beliefs, and the right of qualified voters, regardless of their
> political persuasion, to cast their votes effectively.  Both of
> these rights, of course, rank among our most precious
> freedoms.  We have repeatedly held that freedom of association
> is protected by the First Amendment.  And of course this
> freedom protected against federal encroachment by the First
> Amendment is entitled under the Fourteenth Amendment to the
> same protection from infringement by the States.

Williams v. Rhodes, 393 U.S. 23, 30-31 (1968).

As this Court and higher courts have recognized, the candidates who

appear on the ballot are crucial to the voters' exercise of those First and

Fourteenth Amendment rights.  "[V]oters can assert their preferences only

through candidates or parties or both."  Anderson, 460 U.S. at 787.  "It is to be

expected that a voter hopes to find on the ballot a candidate who comes near to

21

reflecting his policy preferences on contemporary issues." Lubin v. Panish,

415 U.S. 709, 716 (1974).

Third-party and independent candidates in particular play an important

role in the voter's exercise of his or her rights.  "The right to vote is 'heavily

burdened' if that vote may be cast only for major-party candidates at a time

when other parties or other candidates are 'clamoring for a place on the

ballot.'"  Anderson, 460 U.S. at 787 (citing Lubin, 415 U.S. at 716).  "The

exclusion of candidates also burdens voters' freedom of association, because an

election campaign is an effective platform for the expression of views on the

issues of the day, and a candidate serves as a rallying-point for like-minded

citizens."  Id.

Moreover, the Supreme Court has recognized the special place occupied

by alternative candidates in our political system.  In Illinois State Board of

Elections v. Socialist Workers Party, 440 U.S. 173 (1979), the Court

considered an Equal Protection challenge to the Illinois Election Code.  That

statutory scheme required new political parties and independent candidates to

obtain the signatures of 25,000 qualified voters in order to appear on the ballot

in statewide elections, but applied a different standard in elections for offices

AO 72A
(Rev.8/82)

of political subdivisions of the state.  Id. at 175-176.  For those elections,

Illinois law required signatures of 5% of the number of voters who voted in the

previous election for offices of the particular subdivision.  Id. at 176.  The

operation of this scheme required independent candidates and new political

parties in Chicago to collect more than 25,000 signatures.  Id.  The Court held

that the discrepancy rendered the Illinois Election Code unconstitutional under

the Equal Protection Clause of the Fourteenth Amendment.  Id. at 180.

     In emphasizing the important rights implicated by restrictions on access

to the ballot and the role that third parties play in the exercise of those rights,

Justice Marshall wrote for the majority:

> The States' interest in screening out frivolous candidates must
> be considered in light of the significant role that third parties
> have played in the political development of the Nation.
> Abolitionists, Progressives, and Populists have undeniably had
> influence, if not always electoral success.  As the records of
> such parties demonstrate, an election campaign is a means of
> disseminating ideas as well as attaining political office.

Id. at 185.

     But of course the important role played by candidates representing

parties or political bodies outside the two major parties does not grant those

candidates unfettered access to ballots.  Anderson, 460 U.S. at 788 ("not all

23

restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates"); Storer v. Brown, 415 U.S. 724, 730 (1974) ("as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process").  Accordingly, states have enacted comprehensive and complex statutory schemes governing elections.  Each provision of a state's election code "inevitably affects–at least to some degree–the individual's right to vote and his right to associate with others for political ends."  Anderson, 460 U.S. at 788.  These restrictions are, however, generally permissible in light of the state's important regulatory interests, so long as they are reasonable and non-discriminatory.  Id.

Many states, including Georgia, require prospective third-party or independent candidates to demonstrate that they enjoy some public support. These requirements further the state's interest in creating an efficient and transparent election process.  See Jenness v. Fortson, 403 U.S. 431, 442 (1971) ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a

24

political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.").

The controlling case law, however, does not provide a clear guide for determining how much support a candidate seeking ballot access must show. In 1971, the Supreme Court in Jenness v. Fortson held that a candidate must show a "significant modicum of support" to access the ballot.  Id.  Three years later, the Court echoed that language in American Party of Texas v. White.  415 U.S. 767, 789 (1974).  In 1983, the Court in Anderson v. Celebrezze cited Jenness v. Fortson and American Party of Texas v. White for the proposition that states may require a "preliminary showing of substantial support."  460 U.S. 780, 788 (1983).  Again, three years later, the Court reaffirmed that principle, holding that "it is now clear that States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office." Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986).

For the past thirty years, then, the law has been clearly established that states may require candidates seeking ballot access to show some level of

AO 72A
(Rev.8/82)

support.  But, lower courts have grappled with precisely how much support is

required.  As the Ninth Circuit Court of Appeals recently recognized,

> Election cases are difficult.  The historical background for such
> litigation changes rapidly.... [B]allot-access requirements ...
> have proved difficult for courts to evaluate, given both the
> state's compelling interests in preventing fraud and providing
> orderly election administration, and the Constitution's mandate
> for free political expression and participation that require such
> ballot-access restrictions to survive strict scrutiny.

Nader v. Brewer, 531 F.3d 1028, 1040 (9th Cir. 2008).

    With this background in mind, the Court turns to the parties' motions for

summary judgment.

## IV.    Legal Standard – Motions for Summary Judgment

    Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  "The moving

party bears 'the initial responsibility of informing the . . . court of the basis for

its motion, and identifying those portions of the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits,

if any, which it believes demonstrate the absence of a genuine issue of material

fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir.

26

2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences that are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

27

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist.  Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004).

## V.     Cross-Motions for Summary Judgment

In its opinion reversing and remanding the Court's ruling on Defendants' Motion to Dismiss, the Eleventh Circuit instructed the Court to evaluate Plaintiffs' claim under the balancing approach in Anderson v. Celebrezze, 460 U.S. 780 (1983).  In that case, John Anderson, an independent candidate for President, met all of Ohio's substantive requirements for having his name

placed on the ballot for the general election, but he was unable to participate because the filing deadline for candidates had passed.  The question presented to the Supreme Court was whether Ohio's early filing deadline for statements of candidacy placed an unconstitutional burden on the voting and associational rights of Anderson's supporters.

In <u>Anderson</u>, the Supreme Court recognized that the direct impact of Ohio's filing deadline fell on candidates for office, but also noted that the law burdened voters' constitutional rights to associate for the advancement of their political beliefs and to cast their votes effectively.  460 U.S. at 787.  The Supreme Court stated: "Our primary concern is with the tendency of ballot access restrictions to limit the field of candidates from which voters might choose.  Therefore, in approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters."  <u>Id.</u> at 786.

However, the <u>Anderson</u> court cautioned: "Although these rights of voters are fundamental, not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates."  <u>Id.</u> at 788.  "[A]s a

practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Id. (internal quotations and citation omitted). Therefore, "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." Id. Among the States' important regulatory interests are protecting "the integrity and reliability of the electoral process itself." Id. n. 9. For instance, the Supreme Court explained: "The State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." Id.

Given the competing, legitimate interests at stake, the Supreme Court in Anderson rejected a "litmus-paper test" for separating valid and invalid election restrictions. Id. at 789. Instead, the Court adopted a balancing approach.

First, a court must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." Anderson, 460 U.S. at 789. Next, the court must

30

"identify and evaluate the precise interests put forward by the State as justification for the burden imposed by its rule." Id.  In making this determination, the court must consider "the legitimacy and strength of each of those interests" as well as "the extent to which those interests make it necessary to burden the plaintiff's rights." Id.  Only after undertaking this analysis can a court conclude whether the challenged restriction is constitutional.  Courts in the Eleventh Circuit are directed to follow Anderson's approach to determine whether a ballot access law violates the First and Fourteenth Amendments. Bergland v. Harris, 767 F.2d 1551 (11th Cir. 1985).

Following the Eleventh Circuit's remand of this case to this Court, the Court considered Plaintiffs' Motion for Summary Judgment.   As discussed in Part I, *supra*, the Court denied Plaintiffs' Motion, holding that the character of the asserted injury to the right to vote is significant, but that on that record, Plaintiffs had failed to carry their burden to show the Court that the alleged injury is of an appreciable magnitude.  Green Party II, 106 F. Supp. 3d 1314, 1321 (N.D. Ga. 2015).

The Court further held, based on the record at the time, that the State in this case had an "undeniably legitimate" interest.  Id. at 1323.  The Court could

31

not–and did not–conclude that the State had a real need to decrease voter confusion in Georgia.  Id.  The Court did not apply strict scrutiny at that time, because Plaintiffs had not provided evidence that the burden on their rights was "severe."  But, contrary to the State's contention in its present briefs, nor did the Court conclude that strict scrutiny could not apply in this case.  Rather, the Court wrote: "The Court cannot conclude *on the record before it* that the regulation in question here so severely restricts the right to vote as to compel strict scrutiny."  Id. at 1324 n. 5 (emphasis added).

Finally, the Court found that a genuine issue of material fact existed as to whether Plaintiffs had been reasonably diligent in seeking signatures.  The Court held that "Plaintiffs must show that the challenges they face in accessing the ballot are attributable to the particular burdens imposed by Georgia's petition requirements and are not simply a result of the generic difficulty inherent in gaining access to a ballot" and that Plaintiffs failed to carry that burden based on the record then before the Court.  Id. at 1327.  Therefore, the Court held, it could not conclude as a matter of law that Plaintiffs had been unconstitutionally barred from accessing the ballot by the operation of Georgia's laws.  The Court denied Plaintiff's Motion for Summary Judgment.

AO 72A
(Rev.8/82)

Ultimately, the Court concluded that the record did not support a holding for Plaintiffs. The parties have since engaged in additional discovery and have developed the record. The record before the Court now is significantly more robust than it was at the time of the Court's May 19, 2015 Order. As such, the Court essentially must start with a clean slate in its analysis of the parties' cross motions for summary judgment. The Seventh Circuit Court of Appeals has recognized that "the Supreme Court has consistently taken an intensely practical and fact-oriented approach to deciding these election cases." Bowe v. Bd. of Election Comm'rs of City of Chicago, 614 F.2d 1147, 1152-53 (7th Cir. 1980) (declining to make a final determination on a 10% signature requirement "await[ing] a more complete consideration on the merits and facts of this case"). Only now does the Court have the evidence before it to engage in this "practical and fact-oriented" analysis.

The Court now lays out Plaintiffs' and Defendant's arguments that they are entitled to judgment as a matter of law.

A.    Plaintiffs' Motion for Summary Judgment

Plaintiffs allege that O.C.G.A. § 21-2-170's signature requirements "are in excess of those that satisfy constitutional standards and unduly infringe upon

33

the constitutional rights of the Plaintiffs to participate in the electoral process."

(Compl., [1] ¶ 18.)  Section 21-2-170(b) provides:

> A nomination petition of a candidate seeking an
> office which is voted upon state wide shall be signed
> by a number of voters equal to 1 percent of the total
> number of registered voters eligible to vote in the last
> election for the filling of the office the candidate is
> seeking and the signers of such petition shall be
> registered and eligible to vote in the election at which
> such candidate seeks to be elected.

Plaintiffs further allege that the "State of Georgia makes it impossible for

political bodies to alternatively qualify under O.C.G.A. [§] 21-2-180(2) . . .

because the State does not tally the write-in votes accurately, leaving it up to

the counties who usually do not tally the write-in votes."  (Compl., Dkt. [1]

¶ 19.)  Under O.C.G.A. § 21-2-180:

> Any political body which is duly registered [under §]
> 21-2-110 is qualified to nominate candidates for state-
> wide public office by convention if:
>
> (1) The political body files with the Secretary of State
> a petition signed by voters equal in number to 1
> percent of the registered voters who were registered
> and eligible to vote in the preceding general election;
> or
>
> (2) At the preceding general election, the political
> body nominated a candidate for state-wide office and

34

> such candidate received a number of votes equal to 1
> percent of the total number of registered voters who
> were registered and eligible to vote in such general
> election.

Plaintiffs seek judgment as a matter of law that this scheme violates the First

and Fourteenth Amendments to the United States Constitution.

Plaintiffs argue that the test set forth in Anderson requires a finding that

Georgia's scheme is unconstitutional.  The Court now briefly sets out

Plaintiffs' arguments for each step of the Anderson analysis before analyzing

them in detail infra at Part VI.

### 1.   Character and Magnitude of the Asserted Injury

Plaintiffs charge that Georgia's petition signature requirement burdens

three distinct and fundamental rights: (1) Plaintiffs' right to select their own

candidates, (2) "the right of individuals to associate for the advancement of

political beliefs," and (3) "the right of qualified voters, regardless of their

political persuasion, to cast their votes effectively."  (Pls.' Br. in Supp. of Mot.

for Summ. J. ("Pls.' MSJ Br."), Dkt. [76-1] at 8.)

Plaintiffs rely on the developed record to argue that the injury to these

significant rights is severe.  For the 2016 Presidential Election, the "number of

voters equal to 1 percent of the total number of registered voters eligible to vote in the last election for the filling of the office the candidate is seeking" is 50,334.[12]  (Pls.' MSJ Br., Dkt. [76-1] at 10 (citing O.C.G.A. § 21-2-170(b)); see also App'x to 2015 Winger Aff., Dkt. [76-3] at 9.)  This is, then, the number of signatures that Plaintiffs must submit in order to place their candidate on the ballot.

But Plaintiffs submit that a petition would have to contain more than the minimum number of signatures because some signatures may be deemed invalid for a variety of reasons.  (Pls.' MSJ Br., Dkt. [76-1] at 11.)  Some of those reasons stem from other portions of Georgia's election code scheme.  (Id. at 13.)  Also, collecting signatures imposes significant costs on a third-party or independent candidate.  (Id. at 12.)  Finally, third parties or political bodies that constantly face high petition requirements suffer from "petition fatigue."  (Id. at 19-20.)

---

[12]  Plaintiffs calculate this number based on the number of registered voters as of November 2012 as the "last election for the filling of the office" of U.S. President. (Pls.' MSJ Br., Dkt. [76-1] at 10 n.1.)  For non-presidential office, Plaintiffs submit that a candidate would need to gather 51,687 signatures, calculated based on the number of registered voters as of November 2014.

36

Ultimately, Plaintiffs argue that the evidence shows they have been "reasonably diligent and undertaken substantial efforts to nominate [their] candidates in Georgia, and that the challenges [they] face[] in accessing the Presidential ballot are attributable to the particular burdens imposed by the state's petition requirements." (Id. at 21, 29.)

2.    *Interests Advanced by the State*

Plaintiffs contend that the State's asserted interest in avoiding voter confusion and a crowded presidential ballot does not warrant the burdens on their rights.  In support, Plaintiffs point to historical data showing that Georgia "has never suffered from an overcrowded general election ballot for President or resulting voter confusion." (Id. at 33-34.)  Plaintiffs also provide comparisons to other states that allow access to the presidential ballot with lower petition requirements, again asserting that the State's interest is over-stated and not a valid reason for the restrictions imposed.  (Id. at 34-35.)

Further, Plaintiffs emphasize the national nature of a presidential race, arguing that the State's interest is even less important in this case than it would be in other statewide elections.  (Id. at 36-37.)

3.    *Balancing*

37

Plaintiffs argue that the balance of interests compel a finding that the petition signature requirement is unconstitutional. (Id. at 37-38.) Plaintiffs assert that the character and magnitude of the injuries to Plaintiffs' constitutional rights require this Court to apply strict scrutiny. Under that standard, Plaintiffs claim, the minimal interests of the State must yield to Plaintiffs' important constitutional rights. Georgia must instead "choose a signature requirement that has a less drastic impact upon independent or political body Presidential candidates." (Id. at 38.)

B.     Defendant's Motion for Summary Judgment

Defendant seeks a judgment declaring that Georgia's statutory scheme regulating access to the general election ballot is constitutional. (Def. Brian Kemp's Br. in Supp. of Mot. for Summ. J. ("Def.'s MSJ Br."), Dkt. [75-2] at 6.) Defendant asserts that the appropriate standard of review is "less exacting" than strict scrutiny, because the regulations impose "lesser burdens" on Plaintiffs' rights. (Id. at 7 (quoting Burdick v. Takushi, 504 U.S. 428, 434 (1992)).) The State's "reasonable, nondiscriminatory restrictions" can therefore be justified by the State's "important regulatory interests." (Id.)

38

First, Defendant argues that Plaintiffs' facial challenge to O.C.G.A. § 21-2-170 must fail because the statute has previously been held constitutional.  (Id. at 9.)  Moving on to the Anderson analysis, Defendant argues that the burdens imposed by Georgia's ballot access laws are reasonable and non-discriminatory.  (Id. at 11.)  The State highlights that Georgia provides two routes for political bodies to gain access to the general election ballot: through the petition requirements at issue here or through generating sufficient votes at the preceding general election.  (Id.)  The State characterizes the one percent requirement as "relatively modest" and provides examples of statewide candidates who appeared on the general election ballot by petition in Georgia. (Id. at 12.)

The State argues that the reason Plaintiffs cannot access the ballot is because they do not in fact enjoy a modicum of support in Georgia.  (Id. at 14.)  Defendant suggests that "the Georgia Green Party is having an internal struggle on how to grow its party and . . . lacks sufficient membership willing to do the work."  (Id. at 15.)  It claims that the Green Party's past petition efforts have not "demonstrated support by more than a handful of volunteers."  (Id. at 16.)

39

The State makes similar arguments with respect to the Constitution Party of Georgia.  (Id.)

Further, Defendant says that the petition requirements are not unduly burdensome because other portions of Georgia's election code ease the burden on a political body seeking access to the ballot.  (Id. at 17-19.)  For example, for nomination by convention, a political body has 15 months to collect signatures from voters across the state.  (Id. (citing O.C.G.A. §§ 21-2-182 and -183).)  Those voters may be members of any political party and are not limited to signing a single petition.  (Id. (citing Libertarian Party of Florida v. Florida, 710 F.2d 790, 794 (11th Cir. 1983)).)

Next, Defendant argues that the State has a legitimate interest in limiting the general election ballot to political bodies and parties that have demonstrated a modicum of support.  (Def.'s MSJ Br., Dkt. [75-2] at 19-20.)  The State further argues that it was "not required, prior to enacting the regulation, to make a showing 'of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access.'"  (Id. at 20 (citing Munro, 479 U.S. at 194-95 (internal modifications omitted)).)  Plaintiffs and the Court have

40

agreed with Defendant that some restrictions are needed, and Defendant argues that the one percent requirement is reasonable and not severe.  (Id. at 21.) Defendant also emphasizes Georgia's interest in the elections for other statewide offices regulated by O.C.G.A. § 21-2-170.  (Id. at 23.)

Finally, the State urges this Court to apply a "less exacting review."  (Id. at 22.)  The State argues that in Green Party II, this Court held "that Georgia's ballot access measures did not impose a severe burden on Plaintiffs' rights." (Def.'s Resp. to Pls.' MSJ, Dkt. [80] at 7 (citing Green Party II, 106 F. Supp. 3d 1324 at n.5).)  This holding, according to Defendants, precludes the application of strict scrutiny.

The Court now evaluates these arguments.

## VI.   Analysis

First, the Court asks what level of scrutiny should apply.  The Court then moves to consider the Motions based on evidence in the developed record.

For the reasons that follow, the Court concludes that the burden on Plaintiffs' rights is so severe that strict scrutiny applies.  But even if strict scrutiny does not apply, the State's interest in regulating presidential elections is not sufficiently important to warrant the restrictions imposed by O.C.G.A.

41

§ 21-2-170.  Accordingly, regardless of the level of scrutiny applied, the one

percent petition signature requirement in O.C.G.A. § 21-2-170 is

unconstitutional as applied to presidential candidates and cannot stand.

As an initial matter, the State's argument that Plaintiffs' facial challenge

to O.C.G.A. § 21-2-170 must fail because the statute has been previously held

constitutional is inapposite.  Relying on Washington State Grange v.

Washington State Republican Party, the State argues that "a facial challenge

can succeed only when a plaintiff shows that 'no set of circumstances exists

under which the [statute] would be valid, i.e., that the law is unconstitutional in

all of its applications.'" (Def.'s MSJ Br., Dkt. [75-2] at 9 (quoting Washington

State Grange v. Washington State Republican Party, 552 U.S. 442, 449

(2008)).)  "[A] ballot access restriction for presidential elections 'requires a

different balance' than a restriction for state elections."  Green Party I, 551 Fed.

App'x at 984  (quoting Bergland v. Harris, 767 F.2d 1551, 1554 (11th Cir.

1985)).  The Eleventh Circuit has clearly instructed this Court to evaluate the

precise burdens and interests at stake in this case.  Id. at 984.  The Court now

proceeds to engage in that evaluation.

A.    Standard of Review

42

In reviewing challenges to restrictions on candidacy and ballot access under the First and Fourteenth Amendments, a court "must first consider 'the character and magnitude of the asserted injury that the candidate seeks to vindicate.'" Swanson v. Worley, 490 F.3d 894, 902 (11th Cir. 2007) (quoting Anderson, 460 U.S. at 789) (internal modifications omitted). The "character and magnitude" dictates the standard of review the court must apply. When "the state election scheme imposes 'severe burdens' on the plaintiffs' constitutional rights, it may survive only if it is 'narrowly tailored and advance[s] a compelling state interest.'" Swanson v. Worley, 490 F.3d 894, 903 (11th Cir. 2007) (quoting Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997)). In contrast, an election law that burdens the constitutional rights of candidates and voters with "reasonable" and "nondiscriminatory" restrictions is generally justified by "a State's important regulatory interests." Grizzle v. Kemp, 634 F.3d 1314, 1322 (11th Cir. 2011) (citing Burdick, 504 U.S. at 434). In sum, "[l]esser burdens trigger less exacting review." Id. (quoting Swanson, 490 F.3d at 903 (internal modifications omitted)).

AO 72A
(Rev.8/82)

Thus, in order to assess whether, on the current record, strict scrutiny applies to the Plaintiffs' claims under the First and Fourteenth Amendments, the Court must determine whether the burdens imposed by O.C.G.A. § 21-2-170 are "severe" based on the "character and magnitude" of Plaintiffs' asserted harm.  See Grizzle, 634 F.3d at 1322.

### 1.    Character of Rights

Candidacy in and of itself is "an important, if not constitutionally 'fundamental' right."  Grizzle, 634 F.3d at 1321 (quoting Morial v. Judiciary Comm'n of Louisiana, 565 F.2d 295, 301 (5th Cir. 1977)).[13]  But a restriction on candidacy implicates a fundamental right where "the challenged restriction unfairly or unnecessarily burdens the 'availability of political opportunity.'"  Anderson, 460 U.S. at 793 (quoting Clements v. Fashing, 457 U.S. 957, 964 (1982) (plurality opinion)).  That is the case here.

As discussed above at Part V(A)(1), Plaintiffs charge that Georgia's petition signature requirement burdens three distinct and fundamental rights: (1) Plaintiffs' right to select their own candidates, (2) "the right of individuals

---

[13]  In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

AO 72A
(Rev.8/82)

to associate for the advancement of political beliefs," and (3) "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." (Pls.' MSJ Br., Dkt. [76-1] at 8.)

While the Court finds that the first right advanced by Plaintiffs is not implicated in this case, it agrees that the latter two are "among our most precious freedoms." Williams v. Rhodes, 393 U.S. 23, 30-31 (1968). The right of association and the right of voters to cast their votes effectively are significant constitutional rights protected by the First and Fourteenth Amendments.

The First Amendment right of association is central to the operation of our system of government: "Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views." California Democratic Party v. Jones, 530 U.S. 567, 574 (2000). Political parties are an important and long-standing mechanism through which citizens may exercise that right. Id. ("The formation of national political parties was almost concurrent with the formation of the Republic itself."). And candidates are central to a political party's role within the political system. A political

party's candidate "becomes the party's ambassador to the general electorate in winning it over to the party's views." Id.

This case does not involve a challenge to laws that limit or dictate how a party chooses its candidate. Cf., e.g., California Democratic Party, 530 U.S. 567 (2000) (striking down California code provision that forced a political party to open its candidate-selection process to persons wholly unaffiliated with the party); Eu v. San Francisco Cty. Democratic Cent. Comm., 489 U.S. 214 (1989) (striking down California code provisions that restricted the primary activities and regulated internal affairs of political parties). But the cases discussing the right of a political party to select its own candidate emphasize the important role that candidacy plays in the party's First Amendment activity. Indeed, the Supreme Court has noted that "a party's choice of a candidate is the most effective way in which that party can communicate to the voters what the party represents and, thereby, attract voter interest and support." California Democratic Party, 530 U.S. at 574 (quoting Timmons v. Twin Cities Area New Party, 520 U.S. 351, 372 (1997) (Stevens, J., dissenting)). A political body candidate who cannot access Georgia's ballot

46

through the petition process must choose to run as a write-in candidate, or not to run at all.  This effectively hobbles the candidate and the party.

What is more, the candidates' and parties' rights are not the only rights at stake here.  Again, the Court emphasizes that ballot access restrictions have a substantial impact on both candidates *and* voters.  And "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters."  Bullock v. Carter, 405 U.S. 134, 143 (1972).

Above all, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."  Wesberry v. Sanders, 376 U.S. 1, 17 (1964). Furthermore, voters have a right to cast their votes effectively.  Williams, 393 U.S. at 30 ("the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. . . rank[s] among our most precious freedoms").  Accordingly, the constitutional rights at issue here are undeniably important.

  2.  *Magnitude of Injury*

47

The Georgia election code burdens the exercise of the right to vote effectively by the voters writ large.  Simply put, "voters can assert their preferences only through candidates or parties or both."  <u>Anderson</u>, 460 U.S. at 787.  "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues."  <u>Lubin v. Panish</u>, 415 U.S. 709, 716 (1974).  The voters of Georgia do not have the political choice available to citizens in other states.  In this regard, the effect of Georgia's election code is far from "theoretical"–the voters of Georgia have not had the opportunity to cast their ballots for third-party or independent presidential candidates.

Moreover, burdens that fall on new or smaller parties fall disproportionately on "those voters whose political preferences lie outside the existing political parties."  <u>Anderson</u>, 460 U.S. at 793-94 (citing <u>Clements v. Fashing</u>, 457 U.S. 957, 964 (1982)).  To that point, Plaintiffs find that their values and priorities are not reflected by the major parties, and that "the choices [the major parties] offer ... are nearly immaterial to the aspirations of the citizens and voters [Plaintiffs] organize to serve."  (2012 Esco Aff., Dkt. [7-1] ¶ 26.)  Plaintiff the Green Party puts it plainly: "As Greens we believe we're

prepared to help address our communities and our nation's problems.  The

people of Georgia deserve an opportunity to tell us if they agree."  (Id. ¶ 29.)

At bottom, Georgia voters' political choice is limited in a way that

voters' choice in other states is not.

But the rights of voters *outside of Georgia* are also limited.  The burdens

imposed by the State of Georgia indirectly impact voters outside the state's

boundaries as well.  For example, 46 states included Mr. Nader on their ballots

in 2008.  Mr. Nader earned nearly three percent of the popular vote nationally.

(2012 Esco Aff., Dkt. [7-1] ¶ 11.)  The voters in those states who cast their vote

for Mr. Nader cast their vote in hopes that he would win the right to govern.

Mr. Nader ran for a national office and enjoyed widespread national

support–but because he was not included on every state's ballot, he was not

able to mount a truly national campaign.

Plaintiffs' ability to appear on the general election ballot therefore

affects not only the party's rights, but also the First Amendment rights of voters

in Georgia and nationwide.  See Tashjian v. Republican Party of Conn., 479

U.S. 208, 214 (1986) (noting the fundamental importance of "[t]he right to

associate with the political party of one's choice"); Libertarian Party of Ohio v.

49

Blackwell, 462 F.3d 579, 594 (6th Cir. 2006) (emphasizing the national impact of a state's ballot access restriction).  To be sure, a voter does not have an absolute right to vote for a candidate of his or her choice.  See Burdick, 504 U.S. at 441-42 (upholding prohibition on write-in votes in light of permissive scheme of ballot access).  But, as the Sixth Circuit Court of Appeals has noted, "when a candidate wishes to appear as one party's standard-bearer and voters want to exercise their constitutional right to cast a ballot for this candidate, the Court has viewed state-imposed restrictions on this fundamental process with great skepticism."  Libertarian Party of Ohio, 462 F.3d at 588.

Importantly, while a voter is not guaranteed that one of the political parties will reflect his or her values, "the right to vote is heavily burdened if that vote may be cast for only one of two parties at a time when other parties are clamoring for a place on the ballot."  Williams v. Rhodes, 393 U.S. 23, 31 (1968).

Here, the Court finds that the burden O.C.G.A. § 21-2-170 places on the right to vote is severe.  Plaintiffs have put forth evidence showing that Georgia's ballot access signature requirements are substantially higher than those in most other states.  Georgia has had fewer presidential candidates

50

access its ballot as a result, with the last candidate successfully petitioning for access over fifteen years ago.  Additionally, Georgia's laws operated to prohibit ballot access to a candidate that enjoyed widespread national support. This political landscape is a product of not only the challenged one percent signature requirement in O.C.G.A. § 21-2-170, but also of the other provisions providing for alternative access by petition that impose the same one percent requirement.[14]

In other words, the restrictions at issue in this case serve to prevent minor parties from engaging in the fundamental political activity of placing their candidate on the general election ballot in hopes of winning votes and, ultimately, the right to govern.  See Libertarian Party of Ohio, 462 F.3d at 590. The restrictions also limit the ability of voters to cast their votes effectively. As such, the Court finds that the one percent signature requirement in O.C.G.A. § 21-2-170 as applied to presidential candidates imposes a severe burden on associational and voting rights.  Accordingly, strict scrutiny applies.

_____

[14]  The Court's ruling is explicitly limited to striking down the one percent signature requirement in O.C.G.A. § 21-2-170.  But the operation of the Georgia election code as a whole contributes to that specific provision being so severely burdensome.

In so ruling, the Court looks to the decisions of the Sixth and Ninth Circuit Courts of Appeals, which have also applied strict scrutiny in ballot access cases.  In Libertarian Party of Ohio v. Blackwell, the Sixth Circuit Court of Appeals held that a "combination of two Ohio election regulations–the requirement that all political parties nominate their candidates via primary election and the requirement that all minor political parties file a petition with the Secretary 120 days in advance of the primary–impose[d] an unconstitutional burden on [the party's] First and Fourteenth Amendment rights of free association." Libertarian Party of Ohio, 462 F.3d at 582.  The Court found that the regulations imposed a severe burden on the constitutional rights not only of the party, but also of its members and its potential voter-supporters.  Id.  Because the regulations were not narrowly tailored and did not advance a compelling state interest, the court struck down Ohio's scheme for registering new political parties as unconstitutional.  Id.

In Nader v. Brewer, the Ninth Circuit applied strict scrutiny to invalidate two provisions of Arizona's election code regulating ballot access by persons who are not members of a recognized political party.  531 F.3d 1028 (9th Cir. 2008).  In that case, the court considered Arizona regulations that required a

52

non-party candidate seeking a place on the ballot to file a nomination petition

containing a prescribed number of signatures–in 2004 for the office of

presidential elector, 14,694.[15]  Id. at 1031.  Arizona law also required that each

signature be witnessed by the petition circulator.  Id.  Only persons qualified to

register to vote in Arizona could circulate petitions.  Id.  That restriction

excluded all non-residents of Arizona–including Mr. Nader himself–from

circulating petitions in support of Mr. Nader's candidacy.  Id.  The Ninth

Circuit found that the residency requirement "create[d] a severe burden on

Nader and his out-of-state supporters' speech, voting and associational rights."

Id. at 1036.  The court held that even though the state had a "compelling

interest" in preventing election fraud, the regulation was not narrowly tailored

to further that interest.  Id. at 1038.

Other provisions of Arizona's election code also imposed an early filing

deadline of June 9.  The Nader court also applied strict scrutiny to strike down

that early filing deadline.  The court compared Arizona's petition regulations to

those in Libertarian Party of Washington v. Munro, 31 F.3d 759, 762 (9th Cir.

---

[15]  This number is 3% of the registered voters in the political subdivision for
which the candidate is nominated, who are not members of recognized political
parties.  Ariz. Rev. Stat. §16-341(E), (F).

AO 72A
(Rev.8/82)

1994), which upheld a Washington statute requiring minor-party candidates to obtain 200 signatures for statewide office by July 4 of the election year.  Id. at 1039.  The Nader court contrasted the Washington regulations in Libertarian Party of Washington to the Ohio regulations in Anderson.  In Anderson, discussed *supra* at Part V, the plaintiff was forced to file petitions in March and had been unable to get his name on the ballot.  There, the early filing deadline was struck down.  The Nader court found that Mr. Nader's situation was more like the plaintiff's in Anderson than in Libertarian Party of Washington. Unlike the Washington regulation in Libertarian Party of Washington, the Arizona statute imposed a high number of signatures–a number that is approximately half of the number imposed by the Georgia statute in this case. Nader, 531 F.3d at 1039.  Mr. Nader, like the plaintiff in Anderson and like Plaintiffs here, had not been able to get on the ballot.  Id.  For those reasons, the Nader court concluded that the Arizona deadline imposed a severe burden on Mr. Nader's rights, and therefore that strict scrutiny applied.  Because the court found that the state failed to show that the deadline was narrowly tailored to further "compelling administrative needs," the court struck down the Arizona regulation.  Id. at 1040.

AO 72A
(Rev.8/82)

Both Libertarian Party of Ohio v. Blackwell and Nader v. Brewer bolster this Court's determination that strict scrutiny should apply in this case. The burdens to Plaintiffs' constitutional rights are severe. The requirements of Georgia's election code constitute serious impediments to the exercise of Plaintiffs' and the voters' constitutional rights. Accordingly, the Court now moves to consider whether the regulation is narrowly tailored to further a compelling state interest.

B.     Strict Scrutiny

The State advances its interests in limiting voter confusion and avoiding ballot overcrowding in the general election. To be sure, these interests are undeniably legitimate in the abstract, but here, the Court cannot conclude that the restriction in O.C.G.A. § 21-2-170 is narrowly tailored to actually further those interests.

The Supreme Court and the Eleventh Circuit have consistently recognized that limiting voter confusion is an important state interest. Lubin v. Panish, 415 U.S. 709, 715 (1974) ("the State's interest in keeping its ballots within manageable, understandable limits is of the highest order"); Am. Party of Tex. v. White, 415 U.S. 767, 799 (1974) ("[T]he objectives ostensibly

AO 72A
(Rev.8/82)

sought by the State, viz., preservation of the integrity of the electoral process and regulating the number of candidates on the ballot to avoid undue voter confusion, are compelling."); Libertarian Party of Fla. v. Florida, 710 F.2d 790, 793 (11th Cir. 1983) ("[T]he state has an interest in regulating the election process and avoiding voter confusion.  That these . . . are compelling has been well established under decided cases.").  Similarly, avoiding over-crowded ballots is an important state interest.  Munro v. Socialist Workers Party, 479 U.S. 189, 196 (1986) (a state is "clearly entitled to raise the ante for ballot access, to simplify the general election ballot, and to avoid the possibility of unrestrained factionalism at the general election."); Clements v. Fashing, 457 U.S. 957, 965 (1982) ("[T]he Court has emphasized that the States have important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an over-crowded ballot, and in avoiding the expense and burden of run-off elections."); Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 185 (1979) "the Court expressed concern for the States' need to assure that the winner of an election 'is the choice of a majority, or at least a strong plurality, of those voting,

56

without the expense and burden of runoff elections.'") (quoting <u>Bullock v. Carter</u>, 405 U.S. 134, 145 (1972) (footnote omitted)).

But here, the petition requirement is not narrowly tailored to advance the State's interests.  In 2016, Georgia requires in excess of 50,000 signatures in order to access the general election ballot.  But requiring a lower number would ease the burden on voters' and political bodies' rights while still serving the State's interest in avoiding voter confusion and a crowded ballot.

As an initial matter, Georgia offers no evidence of voter confusion.[16] And Justice Harlan, concurring in <u>Williams v. Rhodes</u>, opined that "the presence of eight candidacies cannot be said, in light of experience, to carry a significant danger of voter confusion."  393 U.S. 23, 47 (1968).

Common sense dictates the same result.  Georgia's Presidential Preference Primary ballots often contain many more candidates than the

---

[16]  The State contends that states are not required to make a showing "of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." (Def.'s MSJ Br., Dkt. [75-2] at 20 (quoting <u>Munro v. Socialist Workers Party</u>, 479 U.S. 189, 194-95 (1986)).)  But here, the Court did not ask the State to demonstrate actual confusion *prior* to enactment of a regulation.  Rather, the Court considers whether there is evidence in the record to create a genuine issue of material fact as to the State's need to avoid voter confusion in *this* challenge.  The Court finds that there is not.

AO 72A
(Rev.8/82)

general election ballot.  The 2016 Republican Presidential Preference Primary ballot listed thirteen candidates.  (Pls.' Repl. to Def.'s Resp. Br. in Opp'n to Pls.' MSJ, Dkt. [82] at 8 n.8.)  In 2012, the Republican Presidential Preference Primary ballot listed nine candidates.  (2015 Winger Aff., Dkt. [76-3] ¶ 7.)  A majority of those candidates did not receive one percent of the vote.  (Id.)  But there is no evidence or indication that having that many candidates on the ballot caused voter confusion.  There is similarly no evidence or indication that permitting voters to cast a ballot for a candidate who did not have the support of one percent of voters caused voter confusion.

Additionally, other states have lower signature requirements but do not approach the "confusing" nine candidacies threshold.  Data comparing signature requirements from other states show that no state requiring more than 5,000 signatures has ever had more than six candidates qualify by petition.  (2015 Winger Aff., Dkt. [76-3] ¶ 4.)  Additionally, the only independent candidates who satisfied a petition requirement greater than 5,000 signatures were Ross Perot, John Anderson, Ralph Nader, Eugene McCarthy, and Lyndon LaRouche.  (Id. ¶ 8.)  None were frivolous candidates; all had historical and

58

social significance.  (Id.)  And only two of those five appeared on the Georgia

ballot.  (See App'x to 2015 Winger Aff., Dkt. [76-3].)

All in all, nothing in the record allows the Court to conclude that

Georgia actually faces a danger of voter confusion or ballot over-crowding.

Accordingly, Defendant has failed to demonstrate that the restriction is

narrowly tailored to advance a compelling state interest.  The petition

requirement in O.C.G.A. § 21-2-170 is therefore unconstitutional under a strict

scrutiny standard of review.

But, because "neither the Supreme Court nor [the Eleventh Circuit] has

articulated a clear standard of review for challenges to ballot-access restrictions

in a presidential election," this Court will proceed to analyze the rights and

interests in this case under a more deferential standard.  Stein v. Ala. Secretary

of State, 774 F.3d 689, 691 (11th Cir. 2014).

C.    Deferential Standard

Even under a more deferential standard of review, the petition

requirement cannot stand.  The State's interests in this case are not sufficiently

important.  If a court finds that plaintiffs' rights are not subject to "severe"

restrictions, and therefore that strict scrutiny should not apply, a court must still

AO 72A
(Rev.8/82)

"determine the legitimacy and strength of [the State's] interests [and] consider the extent to which those interests make it necessary to burden the [candidate's] rights." Swanson v. Worley, 490 F.3d 894, 903 (11th Cir. 2007) (quoting Timmons v. Twin Cities New Area Party, 520 U.S. 351, 358 (1997) (internal modifications omitted). "A court then must weigh all these factors to determine if the statute is constitutional." Id. Where a state ballot access provision imposes "lesser burdens," "a State's 'important regulatory interests' will usually be enough to 'justify reasonable, nondiscriminatory restrictions'" upon the plaintiffs' First and Fourteenth Amendment rights. Timmons, 520 U.S. at 358 (quoting Burdick, 504 U.S. at 434).

But the Court emphasizes the balancing nature of this inquiry. Again, neither the Supreme Court nor the Eleventh Circuit have articulated a clear standard of review for ballot access cases. Stein, 774 F.3d at 691. Other Courts of Appeals have recognized that the inquiry turns on balancing countervailing rights. See Rogers v. Corbett, 468 F.3d 188, 194 (3d Cir. 2006) ("Although we appreciate that the strict scrutiny, intermediate scrutiny, and rational basis categories represent a convenient and familiar linguistic device by which courts, including our Court, have characterized their review under

60

Anderson, we note that Anderson promulgated a less categorical system of classification.").  This is a "flexible analysis."  Green Party of Tenn. v. Hargett, 767 F.3d 533, 546 (6th Cir. 2014); see also Green Party of Tenn. v. Hargett, 791 F.3d 684, 693 (6th Cir. 2015) (if the burden on the plaintiffs' rights lies somewhere in between "severe" and "reasonable," "courts will 'weigh[ ] the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it.'").  Indeed, the Supreme Court, too, has recognized that "a more flexible standard applies" to cases analyzed under Anderson.  Burdick v. Takushi, 504 U.S. 428, 434 (1992).

Accordingly, Anderson and its progeny dictate that the Court apply more of a sliding scale than the tiered levels of review.  Proceeding now under a standard more deferential than strict scrutiny, the Court again finds that the one percent signature requirement cannot stand.

In this case, the State's regulatory interest is not sufficiently important to justify the restrictions on the First and Fourteenth Amendment rights of Plaintiffs, the voters in Georgia, and the voters in other states.  Defendant's interest is outweighed by a national interest.  As the Eleventh Circuit stated in its decision remanding this case to this Court, "a state's interest in regulating a

61

presidential election is less important than its interest in regulating other elections because the outcome of a presidential election 'will be largely determined by voters beyond the State's boundaries' and 'the pervasive national interest in the selection of candidates for national office . . . is greater than any interest of an individual state.'" Green Party I, 551 Fed. App'x at 984 (quoting Anderson v. Celebrezze, 460 U.S. 780, 795 (1983)).  As the Eleventh Circuit emphasized, "a ballot access restriction for presidential elections 'requires a different balance' than a restriction for state elections."  Id. (quoting Bergland v. Harris, 767 F.2d 1551, 1554 (11th Cir. 1985)).  That court also reinforced the nature of the state's interest in another recently published case, Stein v. Alabama Secretary of State, 774 F.3d 689, 691 (11th Cir. 2014), again quoting Anderson for the proposition that the state has a "less important" interest in regulating presidential elections.  Accordingly, the law of this case and the controlling law of this Circuit dictate that this Court consider the State's interest as "less important."

The Sixth Circuit Court of Appeals has also recognized the national nature of a presidential election and the corresponding effect on the Anderson balancing analysis.  The Sixth Circuit's reasoning in Libertarian Party of Ohio

62

v. Blackwell reinforces this Court's finding that the State's interest here is not

sufficiently strong.[17]   See Libertarian Party of Ohio v. Blackwell, 462 F.3d 579,

594 (6th Cir. 2006.)  To wit:

> [I]t is important to note that the state's interests in regulating an
> election cannot trump the national interest in having
> presidential candidates appear on the ballot in each state. In the
> context of the presidential election, "state-imposed restrictions
> implicate a uniquely important national interest." Anderson,
> 460 U.S. at 794–95, 103 S.Ct. 1564 (footnote omitted). Strict
> ballot access requirements imposed by states have an impact
> beyond their own borders, placing some limits on a state's
> prerogative to regulate its elections.  Moreover, as opposed to
> state or local elections, the outcome of a presidential election
> largely will be determined by voters outside a state's borders,
> reducing the importance of the state's administrative concerns.

 Id.  In this case as in Libertarian Party of Ohio, the operation of the challenged

election code "does more than burden the associational rights of . . . voters and

candidates. It places a significant state-imposed restriction on a nationwide

electoral process."  Id. (quoting Anderson, 460 U.S. at 795).

---

[17]  The Court discussed Libertarian Party of Ohio v. Blackwell supra at Part
VI(A)(2) in the context of the "character and magnitude" of Plaintiffs' rights, in
support of its decision to apply strict scrutiny.  Here, where the Court proceeds in the
alternative under a more deferential standard, the Sixth Circuit's analysis of the
State's interests also informs this Court's discussion of the burdens on those rights.

63

Of course, the State has a theoretical interest in avoiding voter confusion. But Plaintiffs provided evidence that the danger of voter confusion in this case is no more than theoretical. For example, Plaintiff provided historical evidence that Georgia had no more than five candidates on the presidential ballot at a time when Georgia law did not require petitioning to access the ballot. Prior to 1943, Georgia imposed no petition requirements for candidates seeking to be included on the presidential ballot. In 1924, 1932, and 1936, Georgia's Presidential ballot had five presidential candidates. (Pls.' SOMF, Dkt. [76-2] ¶ 90.) In 1928 and 1940, the ballot had four candidates. (Id. ¶ 91.) Additionally, the Presidential Preference Primary ballots in Georgia contain far more candidates than the general election ballots, and Defendant offered no evidence to show that the number of candidates had caused voter confusion. Ultimately, the State has not provided sufficient evidence to create a genuine issue of material fact as to whether it has an important regulatory interest in avoiding voter confusion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

64

In sum, the State of Georgia does not have a sufficiently important regulatory interest to justify the way that its election code operates to affect elections across the nation.  As discussed in Green Party II, Georgia's ballot access restrictions are among some of the most stringent compared to other states'.  See Green Party II, 106 F. Supp. 3d at 1325.  The Constitution Party has never been able to place its presidential candidate on the ballot in Arizona, Georgia, Indiana, North Carolina, or Oklahoma.[18]  Of those states, Mr. Nader, the former Green Party and independent candidate, was only able to access the presidential ballot in Arizona.  See Nader v. Brewer, 531 F.3d 1028 (9th Cir. 2008) (invalidating portion of Arizona's election code, including a petitioning

---

[18]  Indiana law provides: "A petition of nomination must be signed by the number of voters equal to two percent (2%) of the total vote cast at the last election for secretary of state in the election district that the candidate seeks to represent."  Ind. Code § 3-8-6-3.  North Carolina law requires that an "unaffiliated candidate" must
> file written petitions with the State Board of Elections supporting his candidacy
> for a specified office. These petitions . . . must be signed by qualified voters of
> the State equal in number to two percent (2%) of the total number of voters
> who voted in the most recent general election for Governor. Also, the petition
> must be signed by at least 200 registered voters from each of four
> congressional districts in North Carolina.

N.C. Gen. Stat. § 163-122(a)(1).  An independent candidate seeking access to the ballot in Oklahoma must file "petitions signed by a number of registered voters supporting the candidacy of said candidate for President of the United States equal to at least three percent (3%) of the total votes cast in the last General Election for President."  Okla. Stat. tit. 26, § 10-101.1.

65

requirement, in a challenge brought by Mr. Nader).  In Green Party II, the

Court recognized that individual states of course have an important right to

regulate their own elections.  Here as there, the Court discusses other states'

provisions only to serve as points of comparison as it considers the operation of

Georgia's election code.  See Libertarian Party of Fla., 710 F.2d at 793 ("A

review of the various statutory schemes upheld by the Court supports the view

that states are free to adopt differing means of regulating ballot access, as long

as the particular scheme is not unnecessarily burdensome.").

Thirty-eight states plus the District of Columbia allow presidential ballot

access with 10,000 or fewer signatures.  (Pls.' SOMF, Dkt. [76-2] ¶ 92.)

Twenty-one states imposed petition requirements of between 2,500 and 10,000

signatures during the four presidential elections between 2000 and 2012.  (Id.

¶ 93.)  In only one instance during that period did any of those 21 states have

more than seven presidential candidates on the general election ballot.  (Id.)

The overall average for these states during that period was 5.3 candidates.  (Id.)

While the time periods do not provide for a perfect comparison, the

Court notes that from 1992 to 2012, the average number of candidates on the

presidential ballot in Georgia–excluding the Democratic and Republican Party

66

nominees–was 1.5.  (Pls.' SOMF, Dkt. [76-2] ¶ 95.)  No state had fewer

candidates on its ballot from 1968 to 1988.  (Id.)  Only Oklahoma had fewer

candidates from 1992 to 2012.  (Id.)

     Georgia's scheme is unnecessarily burdensome.  The petition

requirement has impermissibly "maintain[ed] the 'status quo' by making it

virtually impossible for any but the two major parties to achieve ballot

positions for their candidates."  Clements v. Fashing, 457 U.S. 957, 965 (1983).

The Court looks to Alabama's ballot access scheme, recently upheld by the

Eleventh Circuit, as a helpful comparison to illustrate how Georgia's laws

place a high burden on the voters' constitutional rights.

     In Stein v. Alabama Secretary of State, the Court of Appeals affirmed the

district court's opinion, which it adopted and attached to its own opinion.  774

F.3d 689 (2014), aff'g Stein v. Bennett, No. 2:12-cv-42-WKW (N.D. Ala. Sept.

5, 2013).  In that case, the Alabama Green Party, the Constitution Party of

Alabama, and the Libertarian Party of Alabama challenged a portion of

Alabama's election code that distinguishes between candidates of parties who

wish to appear on the ballot with their party identification and candidates who

appear as independents with no party affiliation.  Stein, 774 F.3d at 691-92.

AO 72A
(Rev.8/82)

Each of the party plaintiffs fielded candidates for the 2012 presidential election, but none of the candidates were listed on the ballot with their party affiliations.  Rather, each candidate was listed on the ballot as independent, with no party affiliation.  Id. at 691.

Alabama law provides that, "[f]or a candidate who wishes to appear on the ballot without party identification as an independent, all that is required is filing a petition with 5,000 signatures by September before the election."  Id. at 692 (citing Ala. Code § 17-14-31(a)).  In contrast, "[t]he requirements for a candidate to appear with printed party identification on the General Election ballot (essentially, for the party label to appear alongside the name of a candidate on the ballot) are significantly heightened."  Id.  In effect, Alabama laws place heightened qualification requirements on the parties, not on the candidates.

As Georgia law allows a political body to qualify a slate of candidates through the voting percentage or petition procedures outlined in O.C.G.A. § 21-2-180, so does Alabama law permit a party to qualify through either "performance" or "petition":

68

> In the case of performance, a party may qualify if it achieved at
> least 20% of the entire vote actually cast for a state officer in
> the prior General Election. Ala. Code § 17-13-40. This
> qualification is only good for the next election, so a party must
> continually get 20% of the vote for at least one state officer on
> the ballot in order to qualify under § 17-13-40 for the next cycle.
>
> If a party does not secure 20% of the vote for a state official in
> the previous election, it must file a petition by the date of the
> first primary election for the next election, with the signatures
> of at least 3% of the qualified voters who cast a ballot for
> governor in the last general election. Ala. Code § 17-6-
> 22(a)(1).

Id. at 693.  The parties challenging these provisions in Stein could only obtain

access to the 2012 presidential ballot through the "petition" avenue, which

required submission of 44,828 signatures from registered voters by March 13,

2012.  Id.  The parties did not think they could gather these signatures and "so

they did not try."  Id.  Instead, the parties' candidates–Jill Stein and Gary

Johnson–each gathered 5,000 signatures prior to September in order to access

the Alabama presidential ballot as independent candidates via Alabama Code

§ 17-14-31(a).  Id.  The Stein plaintiffs challenged the Alabama Code on

grounds that the laws discriminate against presidential candidates of

"unrecognized parties" by imposing an early March deadline to appear on the

ballot with a party label, as compared to the "less onerous" September deadline

to appear on the ballot as an independent.  Id. at 693-94.  The court did not

apply strict scrutiny and, weighing the state's interests and parties' rights,

upheld the Alabama laws, including the 40,000 signature requirement for party

petitions.  Id. at 691.  But Stein is distinguishable from this case.

      First, the constitutional rights at stake in this case are undeniably

important.  This case implicates not only the association rights of parties and

candidates, but also the rights of voters to cast their votes effectively.  In

contrast, the analysis in Stein relies only on the burden placed on the parties'

associational rights.  Id. at 694.  The Stein plaintiffs claimed injury to those

rights in that the parties "lost the advantage of building their ranks by

associating with a popular candidate" and the candidates "lost the advantage of

the party label."  Id. at 694.  The district court acknowledged that the Alabama

laws placed a burden on plaintiffs' associational rights, but relied on Timmons

v. Twin Cities Area New Party, 520 U.S. 351 (1997), to conclude that the

burden was not severe.  Id. at 694-95.   In the present case, the Court's analysis

turns on the burden that falls not only on the parties and candidates, but also on

the voters.

AO 72A
(Rev.8/82)

"[M]ore importantly," as the Stein court recognized, "no one argues that Alabama's law keeps third-party candidates off the ballot, only that it makes it harder for them to communicate their party affiliation to voters." Stein, 774 F.3d at 696. "Thus, Alabama's law does not implicate Anderson's 'primary concern,' viz., 'the tendency of ballot access restrictions to limit the field of candidates from which voters might choose.'" Id. (quoting Anderson, 460 U.S. at 786). But that is precisely *this* Court's concern with Georgia's ballot access restriction. In Stein, the voters of Alabama were not burdened in the same way as Georgia voters. Alabama voters were still able to vote for candidates outside the two major parties–the only question in Stein was whether the voters would vote for them as party-affiliated or independent candidates. Indeed, relying on the Supreme Court's precedent in Timmons, the Stein court wrote: "[T]he voting booth is not meant to be a place of voter education; 'ballots serve primarily to elect candidates, not as forums for political expression.'" Id. at 695 (quoting Timmons, 520 U.S. at 363). This is the crucial difference between the Alabama laws upheld in Stein and the Georgia law that the Court strikes down here. In Stein, the "only real consequence of leaving the Party Plaintiffs' names off the ballot" was that the parties and their candidates "could

not use the ballot as a vehicle to communicate with voters." Id. at 695.  In

Stein, Alabama voters had the opportunity to elect the candidates.  In this case,

Georgia voters do not have that opportunity.

To be sure, Stein upheld a petition signature requirement of over 40,000.

But Alabama's scheme is overall more permissive than Georgia's.  Again, the

40,000-plus signatures are required *only* where the candidate wishes to run

affiliated with a party.  The alternative means of accessing the Alabama ballot

by petition–as an independent candidate–requires only 5,000 signatures.  In

Georgia, both code provisions providing for access by petition require

signatures of one percent of voters: over 50,000 for the 2016 election.

Additionally, Alabama allows "unlimited time for the petitioning effort. While

there is a deadline for filing the petition, there is no limitation on the start

date."  Swanson v. Worley, 490 F.3d 894, 898 (11th Cir. 2007).  In contrast,

Georgia law provides that signatures gathered in a petition pursuant to

O.C.G.A. § 21-2-170 must be collected within 180 days.

Accordingly, this case presents a very different balance of rights and

interests than those in Stein.  The Stein court's analysis of the Alabama scheme

72

reinforces for this Court that Georgia's laws unduly burden the parties, the candidates, and–most importantly–the voters.

In holding that Georgia's scheme is impermissibly burdensome, the Court again emphasizes the important position third parties and independent candidates have occupied in this country's political history.  See Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 185 (1979).  Several of these candidates have been historically and socially significant.  See California Democratic Party v. Jones, 530 U.S. 567, 575 (2000) (listing third party candidacies of "President Theodore Roosevelt's Bull Moose Party, the La Follette Progressives of 1924, the Henry Wallace Progressives of 1948, and the George Wallace American Independent Party of 1968").  And Georgia's election code prevents Georgia voters from being able to effectively exercise their political choice in favor of third party or independent candidates.

Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment.  The Court **GRANTS** Plaintiffs' Motion for Summary Judgment and **DECLARES** that the one percent signature requirement in O.C.G.A. § 21-2-170 violates the First and Fourteenth Amendments as applied to presidential candidates.

## VII.   Remedy

Having declared above that the one percent signature provision of O.C.G.A. § 21-2-170 is unconstitutional, Defendant Secretary of State Brian Kemp is hereby **PERMANENTLY ENJOINED** from enforcing that provision against presidential candidates.

Because this is a presidential election year, the Court feels compelled to assure that a procedure is in place to protect the very rights that this Order seeks to secure: specifically, the rights of Georgia voters to fully participate in presidential elections by having a meaningful opportunity to vote for candidates other than those nominated by the two major political parties.  The rights of the voters are significant and accordingly a remedy must be imposed immediately.  Hall v. Holder, 117 F.3d 1222, 1231 n.18 (11th Cir. 1997) ("The right to vote is . . . a right of paramount constitutional significance, the violation of which permits federal court intercession.").

This Court is a court of equity. U.S. Const. art. III, § 2 cl. 1. "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies." Brown v. Bd. of Educ. of Topeka, Kan., 349 U.S. 294, 300 (1955).  "What the Supreme Court said [in Brown v. Board of Education]

AO 72A
(Rev.8/82)

dealing with the question of segregation in the public schools is equally applicable here," in the voting rights context. United States v. Ramsey, 331 F.2d 824, 827 (5th Cir. 1964). Accordingly, it is well within this Court's equitable powers to fashion a remedy in this case. Virginian Ry. Co. v. Sys. Fed'n No. 40, 300 U.S. 515, 552 (1937) ("Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.").

The focus of the challenge in this case is the number of petition signatures required by O.C.G.A. § 21-2-170. The Court finds based on its analysis above that the best way to address this infirmity is by a reduction in the number of signatures required. Accordingly, the Court orders, as an interim measure, that an independent candidate for President or a candidate for President representing a "political body" may qualify pursuant to O.C.G.A. § 21-2-170 by submitting a nomination petition signed by 7,500 voters and which is otherwise in compliance with said code section. The Court's interim requirement will expire when the Georgia General Assembly enacts a permanent provision.

In crafting this remedy, the Court attempts to balance several concerns. First, the Court must ensure that Georgia's election code complies with the United States Constitution.  Second, the Court attempts to avoid an overcrowded ballot.  Third–and as a result of the first and second concerns–the Court hopes to impose a requirement that will address the concerns of both sides here.

To that third end, the Court held an in camera status conference with the parties on March 7, 2016.  (Dkt. [88].)  At that meeting, the Court advised the parties of its intended ruling and asked for the parties' input in crafting a temporary remedy.  At that time, the Georgia General Assembly was still in session.  2016 H.R. 1114 (Jan. 22, 2016).  The Court realized that the end of the legislative session was near, but requested that Defendant confer with the legislative leadership to see if the legislature could address the signature requirement before it adjourned for the session.  The Court does not know whether Defendant did, in fact, confer with the legislative leadership, but on March 14, the Court received correspondence from Defendant's counsel that reiterated Defendant's position that O.C.G.A. § 21-2-170 is indeed constitutional and accordingly did not offer a suggestion for a remedy.  (Mar.

76

14, 2016 Letter from Cristina Correia, Dkt. [90].)  Plaintiffs' counsel submitted

Plaintiffs' suggestion that signatures in excess of 5,000 should not be required.

(Mar. 16, 2016 Letter from Laughlin McDonald, Dkt. [91].)

Plaintiffs' expert presented a statistical analysis to the Court that reflects

that states that impose a signature requirement of greater than 5,000 signatures

will not have a crowded ballot.  (2015 Winger Aff., Dkt. [76-3] ¶ 1.)  Taking

that representation into consideration, and keeping in mind that the Court

would have preferred that the legislature establish an appropriate number in the

first instance, the Court sets the number of signatures required at 7,500 for

presidential candidates until the legislature imposes a permanent requirement.

All other facets of Georgia's election scheme will remain in place.  "In order to

preserve a healthy federalism no more findings and decrees should be made in

this area of conflict between federal law and state action than are necessary."

United States v. Raines, 203 F. Supp. 147, 151 (M.D. Ga. 1961) (discussing the

application of equitable principles in a voting rights challenge brought pursuant

to the Civil Rights Act of 1957, then-codified at 42 U.S.C. § 1971(c)).

When addressing a permanent revision of O.C.G.A. § 21-2-170, the

Court urges the legislature to consider all aspects of Georgia's election scheme

AO 72A
(Rev.8/82)

for presidential candidates, including the notary requirement and the time limits on collecting signatures.[19]  The Court has only addressed the number of petition signatures because the Court finds that to be the most efficient way to remedy the constitutional violation and provide structure for the upcoming election.

The Court imposes a requirement of more than 5,000 signatures because it is confident that this requirement will prevent a crowded ballot.  This does not imply that a signature requirement of 5,000 or less would lead to a crowded ballot; the Court simply cannot make this conclusion based on the record presently before it.  Libertarian Party of Fla. v. State of Fla., 710 F.2d 790, 793 (11th Cir. 1983) (citing American Party of Texas v. White, 415 U.S. 767, 783 (1974)) ("Obviously any percentage or numerical requirement is 'necessarily arbitrary' . . . . At any point, probably a fraction of a percentage point less, or a few petitioners less would not leave the interests of the state unprotected.").

---

[19]  For example, Georgia's neighbor Alabama allows independent candidates to access the ballot with 5,000 signatures and places no time limit on circulating petitions.  See discussion of Stein v. Ala. Sec'y of State, 774 F.3d 689 (11th Cir. 2014) at Part VI(C), supra.  The Court takes judicial notice of Alabama's Certification of Presidential Candidates.  Certification of Presidential Candidates, ALABAMAVOTES.GOV: THE STATE OF ALABAMA'S OFFICIAL ELECTION CENTER, https://www.alabamavotes.gov/ElectionInfo/ElectionInfo2012.aspx?a=voters (last visited Mar. 15, 2016). Alabama had five presidential candidates on its 2012 ballot; this cannot be said to be "overcrowded."

AO 72A
(Rev.8/82)

The Court is sensitive to the State's interests here.  Comparing the requirements of other states, 7,500 signatures places Georgia in the most restrictive third of states.  That is, 66% of states require fewer than 7,500 signatures, while 33% require more.  Again, the Court would have preferred for the legislature to address this issue rather than the Court having to impose an interim measure.  But the Court has done its best to create a workable interim provision without treading too far into matters best left to the State.

## Conclusion

In accordance with the foregoing, Plaintiffs' Motion to Strike Defendant's Reply Brief [84] is **DENIED**.  Defendant Brian Kemp's Motion for Summary Judgment [75] is **DENIED**.  Plaintiffs' Motion for Summary Judgment [76] is **GRANTED**.

Defendant Brian Kemp is **PERMANENTLY ENJOINED** from enforcing the one percent signature requirement in O.C.G.A. § 21-2-170 against presidential candidates.  Until the Georgia General Assembly enacts a permanent measure, a candidate for President may access the ballot by

79

AO 72A
(Rev.8/82)

submitting 7,500 signatures on a petition that otherwise complies with Georgia law.

**SO ORDERED**, this 17th day of March, 2016.

_____

**RICHARD W. STORY**
United States District Judge